MINDY ROTH ET AL. *v.* STAN WESTON
(SC 16565)

Sullivan, C. J., and Borden, Katz, Palmer and Zarella, Js.

Argued September 26, 2001—officially released January 29, 2002

*Robert A. Fuller*, with whom were *Karen A. Stansbury* and, on the brief, *Richard J. Fricke*, for the appellant (defendant).

*G. Randall Avery*, for the appellees (plaintiffs).

*Opinion*

KATZ, J. The defendant, Stan Weston, appeals from the judgment of the trial court granting an application for visitation with the defendant's two minor children to the plaintiffs, Mindy Roth and Donna Campbell, respectively the children's maternal grandmother and maternal aunt, pursuant to General Statutes § 46b-59.[1]

---

[1] General Statutes § 46b-59 provides: "Court may grant right of visitation to any person. The Superior Court may grant the right of visitation with respect to any minor child or children to any person, upon an application of such person. Such order shall be according to the court's best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable, provided the grant of such visitation rights shall not be contingent upon any order of financial support by the court. In making, modifying or terminating such an order, the court shall be guided by the best interest of the child, giving consideration to the wishes of such child if he is of sufficient age and capable of forming an intelligent opinion. Visitation rights granted in accordance with this section shall not be deemed to have created parental rights in the person or persons to whom such visitation rights are granted. The grant of such visitation rights shall not prevent any court of competent jurisdiction from thereafter acting upon the custody of such child, the parental rights with respect to such child or the adoption of such child and any such court may include in its decree an order terminating such visitation rights."

The defendant raised several issues in his appeal to the Appellate Court.[2] We transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c) to address an important issue of first impression, namely, the constitutionality of § 46b-59 under the due process clause of the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution.[3] The defendant claims that, in light of the United States Supreme Court's recent decision in *Troxel* v. *Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), § 46b-59 is either facially unconstitutional or unconstitutional as applied to the facts of the present case. We conclude that the statute is unconstitutional as applied to the extent that the trial court, pursuant to the statute, permitted third party visitation contrary to the desires of a fit parent and in the absence of any allegation and proof by clear and convincing evidence that the children would suffer actual, significant harm if deprived of the

---

[2] In addition to the constitutional issues we address in this opinion, the defendant claimed in his appeal to the Appellate Court that the trial court improperly: (1) exercised jurisdiction under § 46b-59 to consider the plaintiffs' complaint seeking visitation; (2) ordered him not to relocate the children from their current residence; (3) relied upon the opinion of the guardian ad litem who also served as the attorney for the children; and (4) exercised authority to order him to undergo and pay for psychiatric counseling when ordering visitation pursuant to § 46b-59. As we find the constitutional issue dispositive in this case, we need not reach the defendant's other issues. See *Bortner* v. *Woodbridge*, 250 Conn. 241, 251 n.13, 736 A.2d 104 (1999) (court does not decide issue unnecessary to resolution of case); *Duni* v. *United Technologies Corp.*, 239 Conn. 19, 23 n.5, 682 A.2d 99 (1996) (same).

[3] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

visitation. Accordingly, we reverse the judgment of the trial court ordering visitation.

The record discloses the following undisputed facts. The plaintiffs filed a complaint in the trial court seeking visitation with the defendant's children in March, 2000, three months after the defendant's wife had committed suicide.[4] The defendant had refused to permit any contact between the plaintiffs and his children during the months following his wife's death.[5] The plaintiffs' complaint alleged that the family unit had been disrupted by the death of the children's mother and therefore was no longer intact. The plaintiffs further alleged that visitation was in the best interest of the children. They did not, however contend that the defendant was in any way an unfit parent. At the time the plaintiffs filed the complaint, they also filed a motion for visitation pendente lite and a motion for a referral to the family relations division of the Superior Court. The trial court granted the plaintiffs' motions, and appointed a guardian ad litem for the children. Pursuant to the trial court's order, the guardian ad litem scheduled and supervised visits between the defendant's children and the plaintiffs at her office. The defendant's children were ages

[4] The defendant filed a motion to dismiss the plaintiffs' original complaint on the grounds that the trial court did not have jurisdiction to hear the complaint and that the plaintiffs did not have standing. The defendant subsequently filed an amended motion to dismiss, alleging additionally that General Statutes §§ 46b-56 and 46b-59 were rendered unconstitutional by the United States Supreme Court's decision in *Troxel* v. *Granville*, supra, 530 U.S. 57. The trial court held that *Troxel* did not render § 46b-59 unconstitutional, but granted the defendant's motion to dismiss without prejudice on the ground that the plaintiffs had failed to allege a basis for the court's jurisdiction pursuant to the criteria that this court set forth in *Castagno* v. *Wholean*, 239 Conn. 336, 684 A.2d 1181 (1996). Specifically, the complaint failed to allege that the children's mother had died. Thereafter, the plaintiffs filed an amended complaint.

[5] The defendant had made no efforts prior to his wife's death to interfere with the plaintiffs' contact with his wife and children. Immediately after his wife's death, the defendant moved into his mother's house. Thereafter, he refused to allow any contact by the plaintiffs with his children.

two and four at the time the action was commenced; they were ages three and five at the time of the trial.

At trial, the defendant argued that any visitation with Roth should be supervised and that Campbell should be denied visitation altogether. The defendant objected to unsupervised visits with Roth because he contended that, based on her physical condition and her inability to drive or read, she would be unable to act in emergency situations. In addition, the defendant objected to visitation with either plaintiff because he believed that their morals, values and ethics were inconsistent with his own and those that he wished to instill in his children. Specifically, the defendant noted that, many years ago, Roth voluntarily had placed three of her own young children, including the defendant's wife, in foster care with the department of children and families. Roth's children had remained in foster care until they were seventeen years old. Campbell had been involved in pornographic films and had worked as a nude dancer at various adult clubs between 1990 and 1995. The defendant was concerned that it would be detrimental to his children should they learn about Campbell's past activities and that Campbell continued to promote such activities. The defendant testified that he was also concerned that, should Roth be granted unsupervised visitation, she would not prevent Campbell from having contact with the children.

The trial court made the following findings of fact. Both plaintiffs had established loving and responsible relationships with the defendant's children throughout their lives. During the two years preceding the death of the defendant's wife, Roth had visited her daughter and the children two to three times per week. Roth assisted her daughter in caring for the children by making meals, and washing and ironing the children's clothes. She babysat for the children, and occasionally had them sleep over at her house while their mother

or father were away. Campbell also had been close to her sister and the children during the two years preceding her sister's death. Campbell tried to contact her sister each day, knowing that her sister was suffering from mental illness, and also assisted in caring for the children. Campbell purchased furniture and helped prepare a nursery for the children.

The trial court next addressed each of the defendant's objections to visitation. With respect to the defendant's concerns about Roth's unsupervised visitation, the court found Roth to be "a capable and hard-working person without any disabilities." In support of this finding, the trial court noted that Roth had been working at a full-time position caring for a person suffering from Alzheimer's disease. With respect to the defendant's objection to any visitation with Campbell, the court found that Campbell had "reformed from her previous lifestyle . . . [and did] not pose any danger to [the] children because she had changed her ways . . . ." The trial court noted that Campbell had obtained a real estate broker's license in 1996 and had worked successfully in that field for the subsequent three years. Moreover, she had received a bachelor's degree in economics from Fairfield University in 1999. The court noted that Campbell should be commended, rather than condemned, for the steps she had taken to change her life.

The trial court also cited the testimony of Campbell's sister, Kelly Campbell Allen, and the guardian ad litem's report to the court in support of unsupervised visitation. Allen had lived with the defendant and his wife for three years, and had maintained a good relationship with the defendant. Allen testified that it was her belief that the children would not be at risk should unsupervised visitation be granted. The guardian ad litem had submitted a report to the trial court recommending unsupervised visitation with both plaintiffs based upon her observations of them during visitations with the

defendant's children at her office. The guardian ad litem concluded that it was imperative for the children to grow up having a relationship with their mother's family. She further noted that the defendant had demonstrated a hostile attitude toward her regarding the issue of visitation that she found contrary to the children's best interest.

On the basis of these facts and this testimony, the trial court concluded that the plaintiffs had met their burden of proof pursuant to § 46b-59 by clear and convincing evidence that it was in the children's best interest to have unsupervised visitation with both of the plaintiffs. Consequently, the court rendered judgment ordering visitation as follows: (1) unsupervised visitation with Roth for the first weekend of each month; (2) unsupervised visitation with Campbell for the third weekend of each month; (3) one week of unsupervised visitation with Roth during the month of July; and (4) one week of unsupervised visitation with Campbell during the month of August. Moreover, the trial court ordered the defendant not to relocate the children from their current residence without a court order. Finally, the trial court ordered all the parties to participate at their own cost in separate counseling sessions with a court-appointed psychologist until such time as the psychologist determined that counseling was no longer necessary. This appeal followed.

I

The dispositive issue on appeal is whether, in light of the United States Supreme Court decision in *Troxel*, § 46b-59, as interpreted by this court in *Castagno* v. *Wholean*, 239 Conn. 336, 339–52, 684 A.2d 1181 (1996), is unconstitutional, either facially or as applied in this case. Specifically, the defendant claims that, despite the judicial gloss we placed upon § 46b-59 in *Castagno*, the statute nevertheless violates the rights of parents

to rear their children under the due process clause of the fourteenth amendment to the federal constitution and article first, § 8, of the Connecticut constitution.[6] He further claims that even if the statute survives his facial attack, it is unconstitutional as applied by the trial court to the extent that it permits third party visitation contrary to the desires of a fit parent. Tied to this challenge is the threshold issue of jurisdiction. Accordingly, we resolve the claims together.

## A

We begin with a discussion of the two cases that inform the disposition of this appeal. In *Castagno* v. *Wholean*, supra, 239 Conn. 353, we affirmed the trial court's judgment dismissing an action by maternal grandparents seeking visitation rights with the defendants' minor children. We concluded that the trial court did not have subject matter jurisdiction to entertain the petition because the grandchildren and their parents were not involved in any case or controversy then before the court and because there was no claim that the family unit was no longer intact. Id., 352–53. Although § 46b-59 did not include specific language imposing any threshold requirement, we recognized that a literal reading would place the statute in constitutional jeopardy because of the protection traditionally afforded to a parent's right to family integrity, including the right to the care, custody, companionship and management of one's children and the freedom of personal choice in matters of family life. Id., 340. We further recognized that any statute implicating such a fundamental right

---

[6] In the absence of a separate and distinct analysis we will not consider the defendant's claim under the Connecticut constitution. *Ramos* v. *Vernon*, 254 Conn. 799, 814–15, 761 A.2d 705 (2000); *Sweetman* v. *State Elections Enforcement Commission*, 249 Conn. 296, 319 n.19, 732 A.2d 144 (1999); *State* v. *Robinson*, 227 Conn. 711, 721–22, 631 A.2d 288 (1993). We limit our inquiry, therefore, to his federal constitutional claim.

must be strictly scrutinized.[7] Id., 344. As *Castagno* raised a jurisdictional question, the precise challenge was whether the statute was drawn as narrowly as possible to achieve the legislature's purpose. Id., 351–52.

Using established rules of statutory construction, we went beyond the face of the statute to determine whether it could be construed to achieve the legislature's intention and still safeguard this fundamental right. Looking to the broader statutory scheme, specifically to related provisions regarding third party visitation, General Statutes §§ 46b-56[8] and 46b-57,[9] we

[7] We declined at that time to articulate under what circumstances visitation would constitute a compelling interest, as the issue was not before the court and would have required consideration of a "hypothetical set of facts . . . ." (Internal quotation marks omitted.) *Castagno* v. *Wholean*, supra, 239 Conn. 352 n.15.

[8] General Statutes § 46b-56 provides in relevant part: "Superior Court orders re custody, care and therapy of minor children in actions for dissolution of marriage, legal separation and annulment. . . . (a) In any controversy before the Superior Court as to the custody or care of minor children, and at any time after the return day of any complaint under section 46b-45, the court may at any time make or modify any proper order regarding the education and support of the children and of care, custody and visitation if it has jurisdiction under the provisions of chapter 815o. Subject to the provisions of section 46b-56a, the court may assign the custody of any child to the parents jointly, to either parent or to a third party, according to its best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable. The court may also make any order granting the right of visitation of any child to a third party, including but not limited to, grandparents.

"(b) In making or modifying any order with respect to custody or visitation, the court shall (1) be guided by the best interests of the child . . . ."

[9] General Statutes § 46b-57 provides: "Third party intervention re custody of minor children. Preference of child. In any controversy before the Superior Court as to the custody of minor children, and on any complaint under this chapter or section 46b-1 or 51-348a, if there is any minor child of either or both parties, the court if it has jurisdiction under the provisions of chapter 815o, may allow any interested third party or parties to intervene upon motion. The court may award full or partial custody, care, education and visitation rights of such child to any such third party upon such conditions and limitations as it deems equitable. Before allowing any intervention, the court may appoint counsel for the child or children pursuant to the provisions

interpreted the statute so as to incorporate threshold requirements similar to those of §§ 46b-56 and 46b-57 that "would allow § 46b-59 to be invoked only in those instances in which the integrity of the family already has been disrupted. Because § 46b-59 operates in the delicate realm of parent-child relationships, we prefer a construction that minimizes state intrusion." Id., 346. Accordingly, we construed § 46b-59 "to afford the trial court jurisdiction to entertain a petition for visitation only when the minor child's family life has been disrupted in a manner analogous to the situations [included within] §§ 46b-56 and 46b-57." Id., 352.

In deciding *Castagno*, we also relied upon legislative history that reflected the legislative intent "to provide access to the courts for grandparents whose grandchildren's families have been disrupted in a manner similar to that addressed by §§ 46b-56 and 46b-57, but in which the courts have not yet become involved." Id., 350. Accordingly, although we did not state precisely what circumstances would suffice to invoke jurisdiction under § 46b-59, we added that, "[a]lthough the death of a parent or the de facto separation of the parents *may* allow an action, there may be other times when an action is also warranted, such as when there has been a good faith allegation by a third party of abuse or neglect." (Emphasis added.) Id., 352.

Thereafter, in *Troxel* v. *Granville*, supra, 530 U.S. 57, the United States Supreme Court reviewed a decision by the Washington Supreme Court holding its visitation statute facially unconstitutional. That statute provides that "[a]ny person may petition the court for visitation rights at any time including, but not limited to, custody proceedings. The court may order visitation rights for

of section 46b-54. In making any order under this section the court shall be guided by the best interests of the child, giving consideration to the wishes of the child if he is of sufficient age and capable of forming an intelligent preference."

any person when visitation may serve the best interests of the child whether or not there has been any change of circumstances." Wash. Rev. Code § 26.10.160 (3) (2000). The trial court in *Troxel* awarded visitation to the paternal grandparents after their son had committed suicide and the children's mother limited their access to the children. The Washington Supreme Court had held that a state constitutionally may interfere with the fundamental right of parents to rear their children only to prevent harm or potential harm to a child. *In re Custody of Smith*, 137 Wash. 2d 1, 19–20, 969 P.2d 21 (1998), aff'd sub nom. *Troxel* v. *Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Section 26.10.160 (3) of the Washington Code failed to meet that standard because it required no threshold showing of harm. *In re Custody of Smith*, supra, 15–20. Moreover, by allowing " 'any person' to petition for forced visitation of a child at 'any time' with the only requirement being that the visitation serve the best interest of the child," according to the court, the visitation statute swept too broadly. Id., 20. Specifically, the statute authorized a contested visitation order at the behest *of any person at any time* subject only to a best interests of the child standard. Additionally, a parent's decision that visitation would not be in the child's best interest would be accorded no deference, and the best interest determination would rest solely in the discretion of the judge, whose assessment would necessarily prevail regardless of the parent's estimation of the child's best interests. Id., 21. Essentially, the decisional framework authorized by the statute and employed by the trial court directly contravened the traditional presumption that a fit parent acts in the best interest of his or her child. In conclusion, the Washington Supreme Court announced a categorical rule that third parties who seek visitation always must prove that the denial of visitation would harm the child. Id., 20. Short of preventing harm to the child, the

best interests of the child were "insufficient to serve as a compelling state interest overruling a parent's fundamental rights." Id. The court reasoned that because the constitution permits interference with the fundamental rights of parents to rear children only to prevent harm or potential harm, the statute was facially unconstitutional. Id.

Following its grant of certification, a plurality of the United States Supreme Court, hesitant to conclude that a state statute addressing nonparental visitation was per se unconstitutional, held the statute unconstitutional as applied. *Troxel* v. *Granville*, supra, 530 U.S. 67. Despite concerns about the "breathtakingly broad" language of the statute, the plurality explained that "[b]ecause much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a per se matter." Id., 73. The court began with a discussion of the long recognized premise that a parent's interest in the nurture, upbringing, companionship, care, and custody of children are generally protected by the due process clause of the fourteenth amendment.[10] Id., 65. Justice Kennedy cautioned in his dissent, however, that, although this principle exists in broad formulation, courts "must use considerable restraint, including careful adherence to the incremental instruction given by the precise facts of particular cases, as they seek to give further and more precise definition to the right." Id., 95–96.

---

[10] See, e.g., *Meyer* v. *Nebraska*, 262 U.S. 390, 399–401, 43 S. Ct. 625, 67 L. Ed. 1042 (1923); *Pierce* v. *Society of Sisters*, 268 U.S. 510, 535, 45 S. Ct. 571, 69 L. Ed. 1070 (1925); *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); *Wisconsin* v. *Yoder*, 406 U.S. 205, 232, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972); *Quilloin* v. *Walcott*, 434 U.S. 246, 255, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978); *Parham* v. *J. R.*, 442 U.S. 584, 602, 99 S. Ct. 2493, 61 L. Ed. 2d 101 (1979); *Santosky* v. *Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *Washington* v. *Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997).

Turning to the issue of what considerations were sufficiently important to allow a court to impose visitation over parental objection, the plurality of the United States Supreme Court expressly declined to consider the primary constitutional question passed upon by the Washington Supreme Court: whether the due process clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation. Id., 73. Accordingly, the court did not define the precise scope of the parental due process right in the visitation context. Id. Instead, the plurality articulated the factors in that particular case that weighed against the constitutional application of the statutory requirement of the best interest of the child. Id., 67–72. First,there had been no finding of parental unfitness to defeat the traditional "presumption that fit parents act in the best interests of their children." Id., 68. Moreover, the trial court had failed to accord any special weight to the parent's determination of her own child's best interests. Id., 69. Finally, the court noted that there had been no allegation that visitation had been denied entirely. Id., 71.

The court decided, in essence, that "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." Id., 72–73. Because neither the Washington nonparental visitation statute nor the trial court in that case required anything more, the plurality of the court held that the Washington statute, as applied in the case, was unconstitutional. Id., 73.

B

Against the background of these two cases, we revisit § 46b-59 to decide whether, as interpreted by the *Castagno* decision, the statute can withstand a facial constitutional challenge. In *Castagno*, we incorporated a

threshold jurisdictional requirement into § 46b-59 that would permit the trial court to entertain a petition for visitation only when the family life of the minor child had been disrupted either by state intervention analogous to the situations included within §§ 46b-56 and 46b-57 or "in a manner similar to that addressed by §§ 46b-56 and 46b-57, but in which the courts have not yet become involved." *Castagno* v. *Wholean*, supra, 239 Conn. 350. Although this court's interpretation of § 46b-59 was firmly rooted in the legislative history, and was not merely "a strained attempt to salvage an obviously unsalvageable statutory scheme"; *Shawmut Bank, N.A.* v. *Valley Farms*, 222 Conn. 361, 369–70, 610 A.2d 652, cert. dismissed, 505 U.S. 1247, 113 S. Ct. 28, 120 L. Ed. 2d 952 (1992); we are now constrained to conclude that our attempt was imperfect.

We reach this conclusion because it is now apparent that this judicial gloss does not adequately acknowledge the status of parents' interest in the care, custody and control of their children, as "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel* v. *Granville*, supra, 530 U.S. 65. Building on a long line of cases acknowledging the fundamental right of parents to raise their children as they see fit, *Troxel* teaches that courts must presume that "fit parents act in the best interests of their children," and that "so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." Id., 68–69. Moreover, *Troxel* confirms that among those interests lying at the core of a parent's right to care for his or her own children is the right to control their associations. Id. The essence of parenthood is the companionship of the child and the right to make decisions regarding his or

her care, control, education, health, religion and association. *Pierce* v. *Society of Sisters*, 268 U.S. 510, 534–35, 45 S. Ct. 571, 69 L. Ed. 1070 (1925); *Meyer* v. *Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625, 67 L. Ed. 1042 (1923) (noting that liberty interest includes rights of parents to establish home, bring up children and control education). Furthermore, *Troxel* confirms that the family integrity is the core element upon which modern civilization is founded and that the safeguarding of familial bonds is an innate concomitant of the protective status accorded the family as a societal institution. *Troxel* v. *Granville*, supra, 65–66.

Therefore, on the basis of our reexamination of the statute, juxtaposed with the considerations raised in *Troxel*, we conclude that the threshold requirement articulated in *Castagno* fails to protect adequately the fundamental right to rear one's child and the right to family privacy. Accordingly, the holding in *Castagno* that the trial court has jurisdiction to entertain a petition for visitation when the family life of the minor child has been disrupted in a manner analogous to the situations included within §§ 46b-56 and 46b-57 is hereby overruled. We now consider, therefore, what statutory parameters would be consistent with both the constitutional interest at stake and our legislature's intent to limit the court's jurisdiction over nonparental visitation.

1

We begin with the standard of review applicable to this legislative intrusion. Despite its recognition of a parent's liberty interest in the care, custody and control of his or her children in general and in visitation matters in specific, the court in *Troxel* abstained from applying the strict standard of review typically utilized when a state action infringes on enjoyment of a fundamental right. Indeed, courts and commentators alike have noted that the *Troxel* plurality did not specify the appro-

priate level of scrutiny to apply to statutes that infringe on the parent-child relationship. See, e.g., id., 80 (Thomas, J., concurring) (noting that plurality failed to articulate appropriate standard of review but stating that he would apply strict scrutiny); *J.S. & E.S.* v. *D.W. & J.W.*, 835 So. 2d 174, 180 (Ala. Civ. App. 2001); *Santi* v. *Santi*, 633 N.W.2d 312, 317 (Iowa 2001); B. White, note, "Muddling Through the Murky Waters of *Troxel*: Will Grandparent Visitation Statutes Sink or Swim?," 39 Fam. & Conciliation Cts. Rev. 104, 108 (2001). Nevertheless, we conclude that, consistent with the court's determination that a parent's interest in the care, custody and control over his or her children is "perhaps one of the oldest of the fundamental liberty interests recognized by [the] Court"; *Troxel* v. *Granville*, supra, 530 U.S. 65; the application of the strict scrutiny test is required to any infringement it may suffer. *Castagno* v. *Wholean*, supra, 239 Conn. 344 ("The right to family autonomy and privacy acknowledged in the common law has been recognized as so fundamental as to merit constitutional protection. Consequently, any legislation affecting it is strictly scrutinized. See *Wisconsin* v. *Yoder*, 406 U.S. 205, 220–21, 92 S. Ct. 1526, 32 L. Ed. 2d 15 [1972] . . . ." [Citations omitted.]); *Keogh* v. *Bridgeport*, 187 Conn. 53, 66, 444 A.2d 225 (1982) ("[w]hen a statutory classification . . . affects a fundamental personal right, the statute is subject to strict scrutiny and is justified only by a compelling state interest"). We, therefore, consider what jurisdictional and substantive requirements would ensure that the statute is narrowly tailored to achieve a compelling interest.

2

We first examine the jurisdictional prerequisite of standing, that is, which persons may intrude upon a

parent's autonomy. "Standing is . . . a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury [that the complainant] has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy." (Internal quotation marks omitted.) *Connecticut Associated Builders & Contractors* v. *Hartford*, 251 Conn. 169, 178, 740 A.2d 813 (1999). "If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause." (Internal quotation marks omitted.) *Weidenbacher* v. *Duclos*, 234 Conn. 51, 54 n.4, 661 A.2d 988 (1995).

Where fundamental rights are implicated, such as in the present case, standing serves a function beyond a mere jurisdictional prerequisite. It also ensures that the statutory scheme is narrowly tailored so that a person's personal affairs are not needlessly intruded upon and interrupted by the trauma of litigation. See *Rideout* v. *Riendeau*, 761 A.2d 291, 302 (Me. 2000) (sufficient safeguards in standing requirements ensure that statute narrowly tailored because they provide "protection against the expense, stress, and pain of litigation"). Consequently, consistent with our strict scrutiny analysis, we conclude that the standing requirements pursuant to § 46b-59 must be drawn narrowly.

We know from prior analysis that § 46b-59, as initially enacted; see Public Acts 1978, No. 78-69; permitted only grandparents to petition for visitation. *Castagno* v. *Wholean*, supra, 239 Conn. 347–48. In 1983, however, § 46b-

59 was amended to its current form to allow "any person" to petition for visitation, like the Washington statute at issue in *Troxel.* See Public Acts 1983, No. 83-95. We view the 1983 amendment that extended standing to any third person as a reflection of the legislature's recognition that persons other than parents may have substantial relationships with children that warrant preservation. "Ours is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family. The tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition. . . . Even if conditions of modern society have brought about a decline in extended family households, they have not erased the accumulated wisdom of civilization, gained over the centuries and honored throughout our history that supports a larger conception of the family. . . . Decisions concerning child rearing, which *Yoder,* *Meyer, Pierce* and other cases have recognized as entitled to constitutional protection, long have been shared with grandparents or other relatives who occupy the same household—indeed who may take on major responsibility for the rearing of the children. Especially in times of adversity, such as the death of a spouse or economic need, the broader family has tended to come together for mutual sustenance and to maintain or rebuild a secure home life." *Moore* v. *East Cleveland,* 431 U.S. 494, 504–505, 97 S. Ct. 1932, 52 L. Ed. 2d 531 (1977).

We recognize that, in many households, grandparents, as well as people who have no biological relationship with a child, undertake duties of a parental nature and that states have sought to ensure the welfare of children by protecting those relationships. Some states have done this expressly; see Minn. Stat. § 257.022 (2000) (permitting visitation with person with whom

child has established emotional ties creating parent-child relationship); Mont. Code Ann. § 40-4-228 (2001) (same); Nev. Rev. Stat. § 125C.050 (Sup. 1999), as amended by 2001 Nev. Stat. c. 547 (permitting visitation with person with whom child has established "meaningful relationship"); Wis. Stat. § 767.245 (Sup. 2001) (permitting visitation with "person who has maintained a relationship similar to a parent-child relationship"); while others have done so by judicial gloss. See *Youmans* v. *Ramos*, 429 Mass. 774, 783 n.18, 711 N.E.2d 165 (1999) (noting that Probate Court has equitable jurisdiction to award visitation to third parties despite no express statutory authorization).

Therefore, we acknowledge that a person *other than* a blood relation may have established a more significant connection with a child than the one established with a grandparent or some other relative. Conversely, we recognize that being a blood relation of a child does not always translate into that relative having significant emotional ties with that child. Indeed, as § 46b-59 implicitly recognizes, it is not necessarily the biological aspect of the relationship that provides the basis for a legally cognizable interest. Rather, it is the nature of the relationship that determines standing.

Consequently, we conclude that, in light of the presumption of parental fitness under *Troxel*, parents should not be faced with unjustified intrusions into their decision-making in the absence of specific allegations and proof of a relationship of the type contemplated herein. See *Webster* v. *Ryan*, 189 Misc. 2d 86, 123, 729 N.Y.S.2d 315 (2001) ("the court will first conduct a standing hearing to determine if the child does have a parent-like relationship with the person with whom contact is desired"). The extension of statutory rights to persons other than a child's parents "comes with an obvious cost." *Troxel* v. *Granville*, supra, 530 U.S. 64. Proof of the nature of a parent-like relationship between

a person seeking visitation and the child would provide the jurisdictional safeguard necessary to prevent families from having to defend against unjustified petitions for visitation. Accordingly, any third party, including a grandparent or a great-grandparent,[11] seeking visitation must allege and establish a parent-like relationship as a jurisdictional threshold in order both to pass constitutional muster and to be consistent with the legislative intent.

3

We next address the second jurisdictional factor in this analysis, that is: what the third party must allege before intrusion by way of a third party visitation petition is justified. *Castagno* v. *Wholean,* supra, 239 Conn. 338–40. Specifically, we must consider what interest would be sufficiently compelling to warrant state intrusion into a parent's decision to limit or deny visitation to a third party. We begin with the statute, which provides that an order allowing visitation "shall be according to the court's best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable . . . . In making, modifying or terminating such an order, the court shall be guided by the best interest of the child . . . ." General Statutes § 46b-59. On its face, the statute ignores the presumption that parents act in the best interests of their children. Furthermore, it allows parental rights to be invaded by judges based solely upon the judge's determination that the child's best interests would be better

---

[11] State statutes that either define grandparent to include great-grandparent or expressly grant standing to both grandparents and great-grandparents include: Ariz. Rev. Stat. Ann. § 25-409 (2000); Ark. Code Ann. § 9-13-103 (1998); Fla. Stat. c. 752.001 (1997); Idaho Code § 32-719 (Michie 1999); 750 Ill. Comp. Stat. 5/607 (Sup. 2001); Minn. Stat. § 257.022 (2000); Nev. Rev. Stat. § 125C.050 (Sup. 1999), as amended by 2001 Nev. Stat. c. 547; N.D. Cent. Code § 14-09-05.1 (Sup. 2001); Okla. Stat. tit. 10, § 5 (Sup. 1997); Wis. Stat. § 767.245 (2000).

served if the parent exercised his parental authority differently.

The constitutional issue, however, is not whether children should have the benefit of relationships with persons other than their parents or whether a judge considers that a parent is acting capriciously. In light of the compelling interest at stake, the best interests of the child are secondary to the parents' rights. *Brooks* v. *Parkerson*, 265 Ga. 189, 194, 454 S.E.2d 769, cert. denied, 516 U.S. 942, 116 S. Ct. 377, 133 L. Ed. 2d 301 (1995) (finding it "irrelevant" to constitutional analysis that visitation may be in best interest of child); *Rideout* v. *Riendeau*, supra, 761 A.2d 301 ("something more than the best interest of the child must be at stake in order to establish a compelling state interest"); *In re Herbst*, 971 P.2d 395, 399 (Okla. 1998) (noting that court does not reach best interest analysis without showing of harm; absent harm, no compelling interest); *Hawk* v. *Hawk*, 855 S.W.2d 573, 579 (Tenn. 1993) (holding that best interest of child is not compelling interest warranting state intervention absent showing of harm). Otherwise, "[the best interest] standard delegates to judges authority to apply their own personal and essentially unreviewable lifestyle preferences to resolving each dispute." *Rideout* v. *Riendeau*, supra, 310.

The trial court is not better situated to determine the issue based upon *its* best judgment. As *Troxel* instructs, "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Troxel* v. *Granville*, supra, 530 U.S. 72–73. Because parenting remains a protected fundamental right, the due process clause leaves little room for states to override a parent's decision even when that parent's decision is arbitrary and neither serves nor is motivated by the best interests of the child.

There are, however, limitations on these parental rights. Some of these limitations arise out of an appreciation of the state's long recognized interests as parens patriae. See *Reno* v. *Flores*, 507 U.S. 292, 303–304, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993); *Santosky* v. *Kramer*, 455 U.S. 745, 766, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *Parham* v. *J. R.*, 442 U.S. 584, 605, 99 S. Ct. 2493, 61 L. Ed. 2d 101 (1979); *Prince* v. *Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944); see also General Statutes § 10-204a (requiring parents to immunize children prior to school enrollment); General Statutes §§ 14-100a, 14-272a (requiring child restraint in vehicles); General Statutes § 17a-81 (authorizing emergency medical treatment where parent withholds consent); General Statutes §§ 31-23, 31-24 (restricting child labor from certain occupations or workplaces); General Statutes § 53-21a (prohibiting parents from leaving child unsupervised in public accommodation or vehicle). Furthermore, it is unquestionable that in the face of allegations that parents are unfit, the state may intrude upon a family's integrity. *Parham* v. *J. R.*, supra, 603; see General Statutes § 17a-101g (removal of child where imminent risk of harm); General Statutes §§ 17a-112 (j), 45a-717 (termination of parental rights). Therefore, it is clear that a requirement of an allegation such as abuse, neglect or abandonment would provide proper safeguards to prevent families from defending against unwarranted intrusions and would be tailored narrowly to protect the interest at stake. Cf. *J.S. & E.S.* v. *D.W. & J.W.*, supra, 835 So. 2d 184 (visitation statute unconstitutional as applied because not narrowly tailored without requiring showing of harm where parent is fit); *Kyle O.* v. *Donald R.*, 85 Cal. App. 4th 848, 864, 102 Cal. Rptr. 2d 476 (2000) (visitation statute flawed because absent allegation of unfitness of parent, statute not narrowly tailored); *Santi* v. *Santi*, supra, 633 N.W.2d 320 (same).

A more difficult issue is whether the child's own complementary interest in preserving relationships that serve his or her welfare and protection can also constitute a compelling interest that warrants intruding upon the fundamental rights of parents to rear their children. See *Troxel* v. *Granville*, supra, 530 U.S. 86 (Stevens, J., dissenting) (issue of grandparent visitation is not simply "a bipolar struggle between the parents and the State over who has final authority to determine what is in a child's best interests. There is at a minimum a third individual, whose interests are implicated in every case to which the statute applies—the child."); cf. *Santosky* v. *Kramer*, supra, 455 U.S. 760 (parent's and child's interests coincide at parental termination proceeding until showing of parental unfitness).[12] Specifically, we consider whether something *less than* an allegation and proof in support of abuse, neglect or abandonment will suffice to permit an intrusion. This is the issue the Washington court faced, and which the United States Supreme Court avoided. See *In re Custody of Smith*, supra, 137 Wash. 2d 13–21.

We can envision circumstances in which a nonparent and a child have developed such substantial emotional ties that the denial of visitation could cause serious and immediate harm to that child. For instance, when a person has acted in a parental-type capacity for an extended period of time, becoming an integral part of

---

[12] In connection with this part of the analysis it is important to note that the *state's* interest in enabling grandparents to visit with their grandchildren as reflected in § 46b-59 is *not* a compelling state interest consistent with this decisional framework. See *R.S.C. & C.V.C.* v. *J.B.C.*, 812 So. 2d 361, 366 (Ala. Civ. App. 2001) (noting that court did not find that "state's interest in enabling grandparent-grandchild relationships is a 'compelling state interest' for purposes of [its] decisional framework under the Fourteenth Amendment"); *Beagle* v. *Beagle*, 678 So. 2d 1271, 1276 (Fla. 1996) (answering question, whether state's interest in visitation is compelling, in negative); but see *Michael* v. *Hertzler*, 900 P.2d 1144, 1151 (Wyo. 1995) (stating that "compelling state interest exists in maintaining the right of association of grandparents and grandchildren").

the child's regular routine, that child could suffer serious harm should contact with that person be denied or so limited as to seriously disrupt that relationship. Thus, proof of a close and substantial relationship and proof of real and significant harm should visitation be denied are, in effect, two sides of the same coin. Without having established substantial, emotional ties to the child, a petitioning party could never prove that serious harm would result to the child should visitation be denied. This is as opposed to the situation in which visitation with a third party would be in the best interests of the child or would be very beneficial. The level of harm that would result from denial of visitation in such a situation is not of the magnitude that constitutionally could justify overruling a fit parent's visitation decision. Indeed, the only level of emotional harm that could justify court intervention is one that is akin to the level of harm that would allow the state to assume custody under General Statutes §§ 46b-120 and 46b-129—namely, that the child is "neglected, uncared-for or dependent" as those terms have been defined.

We are persuaded, therefore, that an allegation, along with proof thereof, that the parent's decision regarding visitation will cause the child to suffer real and substantial emotional harm likewise presents a compelling state interest that will permit interference with parental rights, provided the petitioner has established a parent-like relationship with the child. See *Beagle* v. *Beagle*, 678 So. 2d 1271, 1275–77 (Fla. 1996) (state can satisfy compelling interest required under state constitution when acting to prevent harm); *Brooks* v. *Parkerson*, supra, 265 Ga. 193 (holding that "state interference with parental rights to custody and control of children is permissible only where the health or welfare of a child

is threatened" under both state and federal constitutions); *In re Herbst*, supra, 971 P.2d 399 ("[a]bsent a showing of harm, [or threat thereof] it is not for the state to choose which associations a family must maintain and which the family is permitted to abandon"); *Hawk* v. *Hawk*, supra, 855 S.W.2d 580 ("[t]he requirement of harm is the sole protection that parents have against pervasive state interference in the parenting process" contrary to their state constitutional right); *Williams* v. *Williams*, 256 Va. 19, 501 S.E.2d 417, 418 (1998) (holding that for "compelling state interest" to exist under fourteenth amendment, justifying order of visitation over objection of child's parents, court must find actual harm to child's health or welfare without such visitation); *In re Custody of Smith*, supra, 137 Wash. 2d 20 ("[s]hort of preventing harm to the child, the standard of 'best interest of the child' is insufficient to serve as a compelling state interest [under the fourteenth amendment] overruling a parent's fundamental rights").

We recognize that some jurisdictions do not consider a showing of harm to the child to be constitutionally required before a third party will be afforded visitation over the parents' objections. See, e.g., *Kansas Dept. of Social & Rehabilitation Services* v. *Paillet*, 270 Kan. 646, 658–59, 16 P.3d 962 (2001) (holding that due process requirements met under statute that requires presumption that fit parent acts in best interest of child and places burden to show otherwise on petitioner); *Zeman* v. *Stanford*, 789 So. 2d 798, 804 (Miss. 2001) (noting that "best interest of the child" is paramount consideration); *West Virginia ex rel. Brandon L.* v. *Moats*, 209 W. Va 752, 551 S.E. 2d 674, 687 (2001) (concluding that two-prong standard of best interest of child and lack of substantial interference with parents' rights meets *Troxel* requirements); see also *Rideout* v. *Riendeau*, supra, 761 A.2d 300–301 (noting that while threat

of harm would be compelling interest, state also demonstrated compelling interest in granting visitation where grandparent functioned as parent to child). We are not persuaded, however, by the reasoning of those jurisdictions. Indeed, although the plurality in *Troxel* avoided the issue, its prior decisions clearly reflect a tolerance for interference with parental decisions only when the health or safety of the child will be jeopardized or there exists the potential for significant social burdens. *Wisconsin* v. *Yoder*, supra, 406 U.S. 230 (exempting Amish from state compulsory education law requiring children to attend public school until age eighteen because Amish children would not be harmed by receiving Amish education); *Pierce* v. *Society of Sisters*, supra, 268 U.S. 534 (holding that state could not interfere with parents' decision to send children to private schools where decision "not inherently harmful"); *Meyer* v. *Nebraska*, supra, 262 U.S. 403 (concluding that "proficiency in foreign language . . . is not injurious to the health, morals or understanding of the ordinary child"); see also *Stanley* v. *Illinois*, 405 U.S. 645, 652–53, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972) (concluding that state may not presume parental unfitness and interfere with unwed father's custody rights absent showing of unfitness); *Prince* v. *Massachusetts*, supra, 321 U.S. 170 (upholding conviction under child labor law of parent who allowed minor child to sell religious magazines because of legitimate state interest in laws designed to prevent "psychological or physical injury" to child).

The family entity is the core foundation of modern civilization. The constitutionally protected interest of parents to raise their children without interference undeniably warrants deference and, absent a powerful countervailing interest, protection of the greatest possible magnitude. *Lassiter* v. *Dept. of Social Services*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981);

*Stanley* v. *Illinois,* supra, 405 U.S. 651. Consequently, interference is justified only when it can be demonstrated that there is a compelling need to protect the child from harm. In the absence of a threshold requirement of a finding of real and substantial harm to the child as a result of the denial of visitation, forced intervention by a third party seeking visitation is an unwarranted intrusion into family autonomy. Accordingly, in the absence of any such requirement of harm, § 46b-59 does not justify interference with parental rights.[13]

In setting forth this admittedly high hurdle, we recognize that there are often substantial benefits to a child in having close and sustained ties with extended family and those persons, while not related by blood, who take on caregiving roles. Grandparents, in particular, can serve an important role, especially after a parent dies. *Brooks* v. *Parkerson,* supra, 265 Ga. 194 (noting that "there are . . . many instances where the grandparent-grandchild bond is beneficial to the child"); *In re Herbst,* supra, 971 P.2d 399 ("[t]his court recognizes that in many families the preservation of intergenerational, grandparent relationships has value as a social ideal and should be encouraged by courts as well as social institutions whenever possible"). As the court in *Troxel* stated, however: "In an ideal world, parents might always seek to cultivate the bonds between grandparents and their grandchildren. Needless to say, however, our world is far from perfect, and in it the decision whether such an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance." *Troxel* v. *Granville,* supra, 530 U.S. 70.

---

[13] We recognize that the burden of harm that the statute imposes may be deemed unusually harsh in light of the fact that visitation, as opposed to custody, is at issue. We draw no distinction, however, for purposes of this discussion. Visitation is "a limited form of custody during the time the visitation rights are being exercised . . . ." (Citation omitted.) *In re Marriage of Gayden,* 229 Cal. App. 3d 1510, 1517, 280 Cal. Rptr. 862 (1991).

4

The last factor to be considered is what standard of proof must be required in order for the intrusion of this nature to be justified. When constitutional issues are at stake, a heightened evidentiary standard is warranted. See *Cruzan* v. *Director, Missouri Dept. of Health*, 497 U.S. 261, 282–83 and 283 n.10, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990); *Santosky* v. *Kramer*, supra, 455 U.S. 756–57; see also *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 796, 700 A.2d 1108 (1997) (noting that "[c]onsistent with the heavy burden that [the clear and convincing] standard of proof imposes, courts and legislatures have employed it in constitutional, legislative and common-law contexts involving extremely significant questions of fact"). Accordingly, several states apply a clear and convincing standard of review in visitation proceedings. See Mont. Code Ann. § 40-4-228 (2001) (clear and convincing evidence required to show natural parent has engaged in conduct contrary to parent-child relationship and that nonparent has established child-parent relationship, continuation of which is in child's best interests); Neb. Rev. Stat. § 43-1802 (2) (1998) (clear and convincing evidence that visitation will not "adversely interfere with parent-child relationship"); Nev. Rev. Stat. § 125C.050 (Sup. 1999), as amended by 2001 Nev. Stat. c. 547 (clear and convincing evidence required to rebut presumption that visitation is not in best interests of child); R.I. Gen. Laws § 15-5-24.3 (a) (2) (v) (2000) (clear and convincing evidence required to rebut presumption that parent's decision was reasonable); Va. Code Ann. § 20-124.2 (Michie 1998) (court may award visitation to any person with legitimate interest upon showing by clear and convincing evidence that child's best interest served thereby); Wash. Rev. Code § 26.09.240 (3) (2000) (requiring clear and convincing evidence that petitioner has significant relationship with child); *Hunter* v. *Carter*, 226 Ga. App.

251, 253–54, 485 S.E.2d 827 (1997) (adding standard of proof of clear and convincing evidence as judicial gloss to visitation statute).

We recognize that due process requires the clear and convincing test be applied to the termination of parental rights because it is the *complete severance* by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent; *Santosky* v. *Kramer*, supra, 455 U.S. 747–48; while abuse and neglect petitions require proof only by a preponderance of the evidence because "any deprivation of rights [at that stage] is reviewable and nonpermanent and, thus, warrants a slightly less exacting standard of proof." (Internal quotation marks omitted.) *In re Shamika*, 256 Conn. 383, 401 n.22, 773 A.2d 347 (2001). It is evident, however, that in the visitation context, the heightened standard of clear and convincing evidence is not constitutionally mandated. Nevertheless, "[a]ppellate courts possess an inherent supervisory authority over the administration of justice. *Pinsky* v. *Statewide Grievance Committee*, 216 Conn. 228, 232, 578 A.2d 1075 (1990); *State* v. *Holloway*, 209 Conn. 636, 645-46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989); *State* v. *Ross*, 208 Conn. 156, 158–59, 543 A.2d 284 (1988); *State* v. *Madera*, 198 Conn. 92, 99, 503 A.2d 136 (1985) . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Pouncey*, 241 Conn. 802, 812, 699 A.2d 901 (1997). This court has relied upon these supervisory powers to delineate judicial rules in order to safeguard important rights. See, e.g., *State* v. *Santiago*, 245 Conn. 301, 333, 715 A.2d 1 (1998) ("[u]nder our supervisory powers, we have adopted rules intended to guide the lower courts

in the administration of justice in all aspects of the criminal process").

We believe the stricter standard of proof is sounder because of the ease with which a petitioning party could otherwise intrude upon parental prerogative. Unlike with a petition by the department of children and families alleging abuse or neglect; General Statutes § 46b-129; "there is no real barrier to prevent a [party], who has more time and money than the child's parents, from petitioning the court for visitation rights. A parent who does not have the up-front out-of-pocket expense to defend against the . . . petition may have to bow under the pressure even if the parent honestly believes it is not in the best interest of the child." (Internal quotation marks omitted.) *Rideout* v. *Riendeau*, supra, 761 A.2d 310 (Alexander, J., dissenting). The prospect of competent parents potentially getting caught up in the crossfire of lawsuits by relatives and other interested parties demanding visitation is too real a threat to be tolerated in the absence of protection afforded through a stricter burden of proof. Therefore, pursuant to this court's inherent supervisory powers; see *State* v. *Santiago*, supra, 245 Conn. 333–34; *State* v. *Coleman*, 242 Conn. 523, 540–42, 700 A.2d 14 (1997); *State* v. *Pouncey*, supra, 241 Conn. 812–13; we determine that a nonparent petitioning for visitation pursuant to § 46b-59 must prove the requisite relationship and harm, as we have previously articulated, by clear and convincing evidence.

## C

We recognize that, currently, § 46b-59 does not expressly impose the limitations necessary for the statute to comport with constitutional doctrine. It does not reflect the rebuttable presumption of parental fitness. It does not contemplate any actual or imminent harm to the child that must be prevented by third party visitation

rights. Indeed, § 46b-59 presents no compelling interests of the state or the child. Nor does it address the nature of the relationship between the child and the person seeking visitation. Moreover, the statute does not indicate the allegations and proof required to override the parent's fundamental right to make decisions regarding unsupervised visitation of his or her child with a nonparent. Finally, § 46b-59 does not describe the heightened burden of proof necessary to justify infringement on such a right as has been established in numerous states for grandparents seeking visitation. *Troxel* v. *Granville*, supra, 530 U.S. 70.

Ordinarily, "[i]f literal construction of a statute raises serious constitutional questions, we are obligated to search for a construction that will accomplish the legislature's purpose without risking the statute's invalidity." *Sassone* v. *Lepore*, 226 Conn. 773, 785, 629 A.2d 357 (1993). That adjudicative technique, however, presumes that an alternative, constitutional interpretation remains available. As interpreted by *Castagno*, the statute currently requires no more than the fact that the family had been disrupted. Without proper gloss, the statute would be subject to application in a manner that would be unconstitutional.

We have the option simply to invalidate the statute. That course, however, would leave adrift the significant interests of the *children* harmed by the loss of visitation with a loved one, and would cause significant uncertainty concerning the rights of, and the limitations upon those persons seeking visitation. Moreover, such a decision would entail significant questions concerning the effect of the invalidation of § 46b-59 upon related provisions of §§ 46b-56 and 46b-57. See footnotes 8 and 9 of this opinion. We therefore delineate a scheme consistent with the aforestated principles that will allow the statute to continue to function within the bounds of the constitution.

"Although courts rarely craft remedies of this sort, we note that it is not unprecedented for the judiciary in exceptional circumstances to delineate a procedural scheme for the protection of constitutional rights where statutory protections fall short or are nonexistent. See, e.g., *Miranda* v. *Arizona*, 384 U.S. 436, 467, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (fashioning procedures for police interrogations in order to protect fifth amendment right against self-incrimination); see also *Weeks* v. *United States*, 232 U.S. 383, 34 S. Ct. 341, 58 L. Ed. 652 (1914) (adopting exclusionary rule in order to protect against unconstitutional searches and seizures by federal authorities); *Mapp* v. *Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961) (extending exclusionary rule to states); *United States* v. *Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974) (clarifying that exclusionary rule 'is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect') . . . ." (Citation omitted.) *Worsham* v. *Greifenberger*, 242 Conn. 432, 444, 698 A.2d 867 (1997) (holding that for abatement provision of General Statutes § 31-293 to be invoked against party, notice given pursuant to statute must comport with both statutory requirements and due process clause and must contain specifically enumerated criteria). Therefore, we are ready to make another attempt at providing a judicial gloss in yet another, and hopefully final, attempt to salvage § 46b-59.

Implicit in the statute is, as we have stated, a rebuttable presumption that visitation that is opposed by a fit parent is not in a child's best interest. In sum, therefore, we conclude that there are two requirements that must be satisfied in order for a court: (1) to have jurisdiction over a petition for visitation contrary to the wishes of a fit parent; and (2) to grant such a petition.

First, the petition must contain specific, good faith allegations that the petitioner has a relationship with

the child that is similar in nature to a parent-child relationship. The petition must also contain specific, good faith allegations that denial of the visitation will cause real and significant harm to the child. As we have stated, that degree of harm requires more than a determination that visitation would be in the child's best interest. It must be a degree of harm analogous to the kind of harm contemplated by §§ 46b-120 and 46b-129, namely, that the child is "neglected, uncared-for or dependent." The degree of specificity of the allegations must be sufficient to justify requiring the fit parent to subject his or her parental judgment to unwanted litigation. Only if these specific, good faith allegations are made will a court have jurisdiction over the petition.

Second, once these high jurisdictional hurdles have been overcome, the petitioner must prove these allegations by clear and convincing evidence. Only if that enhanced burden of persuasion has been met may the court enter an order of visitation. These requirements thus serve as the constitutionally mandated safeguards against unwarranted intrusions into a parent's authority.

## II

Ordinarily, in determining whether the trial court had jurisdiction over a petition for visitation, we simply would examine the allegations of the petition and compare them to the jurisdictional requirements set forth herein. That approach in the present case, however, would be manifestly unfair, because these requirements are newly stated, and the plaintiffs could not have anticipated their adoption. We therefore examine, instead, not only the allegations, but also the proof adduced by the plaintiffs to determine whether, if either is insufficient, our remand should give the plaintiffs an opportunity to amend their petition. In other words, if the record were to contain evidence that could support our newly

stated requirement of proof, we would be inclined, rather than direct the trial court to dismiss the petition outright, to permit the plaintiffs to amend the petition so that it might satisfy those requirements on a new trial. We conclude, however, that: (1) the allegations are facially insufficient to invoke properly the court's jurisdiction; and (2) the evidence could not, even under a generous interpretation, satisfy the requisite burden of persuasion as we have articulated it herein. We therefore conclude that the petition must be dismissed.

We first address the requirement that the plaintiffs establish that they have had a parent-like relationship with the children. The plaintiffs' complaint alleges merely that they are the maternal grandmother and maternal aunt to the defendant's children. In addition to being close blood relations to the children, however, the record supports the trial court's conclusion that both Roth and Campbell had developed loving and responsible relationships with the children. In the two years preceding the death of the children's mother, both of the plaintiffs regularly visited with or telephoned the children, as much as several days per week.[14] They participated in the children's birthday celebrations, took the children to parks, and played with the children at their home. Roth frequently stayed overnight at her daughter's house with the children and on occasion the children stayed at Roth's house when their parents were away. The defendant's oldest child, his daughter, occasionally slept overnight at Campbell's home.

Although these facts reflect that the plaintiffs were involved in an ongoing relationship with the children, we conclude that they fail to establish the type of rela-

---

[14] The defendant argues in his brief that the amount of contact is in dispute. On cross-examination, however, the defendant admitted that he could not state definitively how often the plaintiffs visited as he was often at work at the times of the plaintiffs' purported visits.

tionship we have articulated herein. The plaintiffs have not shown that they have acted in a parental type of capacity to the children as required under § 46b-59.

With respect to the second jurisdictional requirement, the plaintiffs' complaint is silent as to the issue of whether the court's denial of visitation would result in actual, significant harm to the children. The trial court concluded that the plaintiffs had "met their burden of proof by clear and convincing evidence that it will be in the minor children's best interests to have unsupervised visitation with these plaintiffs . . . ." As we previously have discussed, however, the statutory standard of the best interest of the child is a much lower threshold than the requirement of proving significant harm. Thus, we examine the basis for the trial court's conclusion to determine if it nevertheless properly considered the issue of harm.

We first note that it is evident from the record that the trial court allocated the burden to the *defendant* to *disprove* harm rather than on the *plaintiffs* to *prove* harm. The trial court's memorandum largely focused on explaining why the defendant's objections to visitation were unfounded. *Troxel* makes it clear, however, that there is a presumption that a fit parent's decision is in the best interest of the child. *Troxel* v. *Granville*, supra, 530 U.S. 69. In the present case, there was neither an allegation nor a finding that the defendant was an unfit parent.[15] Thus, it was the plaintiffs' burden to overcome the presumption in favor of the defendant's decision by showing that the deprivation of visitation would cause significant harm to the children, not the defendant's burden to prove that his concerns were objectively reasonable.[16] Therefore, we conclude that "[t]he

---

[15] To the contrary, a review of the record indicates that the trial court conceded that the defendant was an excellent father.

[16] With respect to the defendant's concerns about Campbell's prior activities, we note the trial court's admonition that "[s]he should be commended more than condemned for turning her life around." It is a parent's constitu-

decisional framework employed by the Superior Court directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child. . . . In that respect, the court's presumption failed to provide any protection for [the defendant's] fundamental constitutional right to make decisions concerning the rearing of [his] own [children]." (Citation omitted.) Id., 69–70.

The second flaw in the trial court's analysis in this case was that it focused on whether the children would be harmed should visitation be *granted,* rather than whether there would be significant harm to the children were visitation *denied.* See *Brooks* v. *Parkerson,* supra, 265 Ga. 194 ("even assuming grandparent visitation promotes the health and welfare of the child, the state may only impose that visitation over the parents' objections on a showing that failing to do so would be harmful to the child"); *Neal* v. *Lee,* 14 P.3d 547, 550 (Okla. 2000) (reversing trial court decision because "no court has found that . . . the children will suffer harm without court ordered grandparent visitation"). For example, the trial court noted in its decision that Campbell "would not pose any danger to these children because she has changed her ways . . . ." Similarly, with respect to the defendant's concerns that Roth would be unable to handle adequately an emergency situation, the court found Roth "capable and . . . without any disabilities." Additionally, the trial court noted the testimony of Allen, the defendant's sister-in-law, that "[s]he [did] not believe these children would be under any risk with unsupervised visitation." None of these findings, however, addresses the issue of whether a denial of visitation would cause real and significant harm to the children. Rather, they reflect a lack of deference to the

tionally protected role, however, not the court's role, to dictate what values to instill in that parent's children.

parent who is presumed to act in the best interests of the children.

The lone reference to harm that might result were the trial court to deny visitation was implicit in the guardian ad litem's report, which the court relied upon in granting visitation. That report concluded: "In my opinion, it is imperative that these children, ages 3 and 5, grow up knowing and being involved with their mother's family." The guardian ad litem offered no basis for her conclusion other than her observation that the children enjoyed their court-ordered visits with the plaintiffs at her office.[17] This benefit, however, does not rise to the level required to justify ordering visitation contrary to the wishes of a fit parent. As the Oklahoma Supreme Court noted, a "vague generalization about the positive influence many grandparents have upon their grandchildren falls far short of the necessary showing of harm which would warrant the state's interference with this parental decision regarding who may see a child. With respect to our constitutional evaluation, whether a court ordered grandparent relationship might be thought of as better or more desirable for a child is not relevant." *In re Herbst*, supra, 971 P.2d 399.

In the present case, the plaintiffs neither alleged that the children would be significantly harmed were the court to have denied visitation nor proved that fact by clear and convincing evidence.[18] Therefore, we con-

---

[17] The guardian ad litem submitted the report after observing three visitations between the defendant's children and the plaintiffs. The report stated in relevant part: "Prior to the death of [the children's mother], the [plaintiffs] were extremely involved in the lives of the children. After the tragic death of the mother, the [defendant] terminated visitation between his children and [the] mother's family. . . . There is no doubt in my mind, after observing these children with [the plaintiffs] that they enjoy their visits with their mother's family. Initially, the children were pensive and timid, but the more time they spent with their extended family, the more comfortable the children became. By the third and final visit, both children were thoroughly enjoying [the plaintiffs]."

[18] Indeed, based upon the record in this case, they *cannot* meet this burden.

clude that the trial court improperly applied the analytical framework set forth in this opinion and improperly granted visitation rights to the plaintiffs in violation of the defendant's due process rights under both the state and federal constitutions.

In the absence of the essential allegations and proof in support thereof, both of the nature of the relationship between the plaintiffs and the defendant's minor children as well as the harm that the children would suffer were visitation denied, the trial court did not have jurisdiction over the petition for visitation.

The judgment is reversed and the case is remanded with direction to dismiss the petition.

In this opinion the other justices concurred.