[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: PLAINTIFF'S (#112) MOTION FOR ORDER RE: VISITATION (PENDENTE LITE)
This is an action for visitation with two minor children commenced by the Plaintiff; Nancy Lavoie, pursuant to Section 46b-59, Connecticut General Statutes.
That statute has recently come under the scrutiny of our Supreme Court and Appellate "Court. The most significant decision being Roth v. Weston, 259 Conn. 202 (2002) wherein the court determined the jurisdictional prerequisites which must be established before a trial court may hear and grant any application for visitation by non-parents.
The instant case is governed by the jurisdictional prerequisites set forth in Roth. Notwithstanding that fact, the court finds, for the reasons set forth herein after, that this case is distinguishable from Roth and enters the orders set forth below.
The plaintiff filed the instant motion (#112) for visitation pendente lite. The parties each appeared, with counsel, and offered evidence and testimony concerning the relief sought in the motion. The Court then reserved decision and allowed counsel to file briefs in support of their respective positions.
The evidence and testimony offered at the hearing on the motion permits the Court to make the following findings of fact.
The defendant, Sandra McIntyre, is the biological mother of the two minor children, Brendan MacIntyre, born March 5, 1997 and Jessica MacIntyre, born June 6, 1999.
The plaintiff and defendant have known each other for over nine years and began living together in April, 1993 in what the plaintiff described as a "committed lesbian relationship. " CT Page 15198
The parties mutually agreed to start a family as a couple by the process of alternative insemination, formerly described as "artificial insemination".
It was further agreed that the defendant, MacIntyre, would be the birth mother and that all decisions regarding that process would be jointly made by Lavoie and MacIntyre.
The plaintiff was immediately ruled out as the birth mother for the reason that she had previously undergone surgery to prevent future pregnancies after having given birth to two children.
Preliminary decisions made by both parties regarding insemination included consideration of the characteristics of the sperm donor; including ethnicity, which was to be French and Irish to ensure some similarity to both Lavoie and MacIntyre.
The cost of insemination was approximately $600 per month per attempt. The process was attempted several times, but at least three miscarriages were suffered by MacIntyre. Each of the parties shared in the expense, including the cost of sperm which was not covered by insurance. Lavoie attended all insemination sessions with MacIntyre. During the time the attempts at fertilization were occurring, the parties told their friends, associates and eventually their families that they were attempting to have a child together.
When MacIntyre became pregnant, plans were made for a baby shower at the V.F.W. hall and both parties invited their friends and relatives — both received a corsage as part of the celebration.
In anticipation of the birth of Brendan, both parties met with their pediatrician and it was agreed that either party could present the child for medical care and treatment. The parties attended Lamaze classes together.
Brendan was born on March 5, 1997 in Danbury Hospital. The plaintiff was the only visitor in the delivery room during the birth.
Birth announcements in the form of personalized Hershey Bar wrappers were custorm-ordered by the parties. The reverse side of the wrapper referencing Brendan's birth read "Made by Nancy and Sandy."
When the defendant resumed employment after the birth, the parties mutually arranged for a daycare provider, and both attended daycare CT Page 15199 appointments to be sure the provider had no problem with either of them being authorized to bring or take Brendan to and from daycare.
Lavoie, MacIntyre and the minor child, Brendan, lived together and Lavoie, as well as MacIntyre, provided the child with the daily care and attention any parent would give to a child.
The parties subsequently agreed to contract for another insemination process for the purpose of creating a second child.
Arrangements were jointly made and they included the procurement of sperm from the same donor who had provided sperm for Brendan's conception. This was done to assure a sibling relationship between the children.
Events leading up to the birth of the second child, Jennifer, were very similar to those leading up to Brendan's birth.
The process was paid for by joint funds of the parties. Lavoie attended the insemination procedures and she, again, was the only visitor in the delivery room at Danbury Hospital when Jessica was born on June 6, 1999.
The parties chose the design of an identical birth announcement candy wrapper for Jessica, which was painted "Made by Nancy and Sandy,"
Lavoie cared for Brendan at home during MacIntyre's two day stay in the maternity wing. The plaintiff brought Brendan in to visit the defendant and baby Jessica.
From even a tender age, Brendan addressed the plaintiff as "Momma" and the defendant as "Mommy" and he was quick to correct anyone who mixed up the names of the parties.
The parties, themselves, and their family members referred to the plaintiff and defendant by those same names in the children's presence.
As Jennifer grew, Lavoie's role in her life was somewhat limited because of the hours of the plaintiff's employment and Jennifer's waking/sleeping routine.
The parties and the children resided together as family in a home which the parties had purchased jointly, until January 2001, at which time the relationship between the parties broke down and the plaintiff left the residence. CT Page 15200
The parties agreed upon visitation by Lavoie with the children from January 2001 until June 2001. At that time, the alternate weekend visits were cut back to a Saturday-Sunday overnight visit, MacIntyre also modified the plaintiff's Tuesday night visits from 5:00 p. m. to 7:30 p. m.
After June 2001, Lavoie was no longer allowed to visit the children in their home.
MacIntyre stopped accepting from the plaintiff a weekly contribution of $100 paid for the children's support. While the defendant would not accept those payments, the plaintiff paid them on a weekly basis into an account opened for that purpose.
Eventually, Lavoie was not allowed any appreciable visitation or access to the children by MacIntyre and she then commenced this action for an order of visitation pursuant to Section 466-59 of the Connecticut General Statutes.
The plaintiff subsequently filed an Amended Visitation Complaint dated July 9, 2002. Her prayer for relief includes the request for "an order of visitation which provides for frequent, consistent and regular contact between the minor child [sic] and the plaintiff"
On June 3, 2002, the plaintiff filed the instant Motion (#112) for Order re: Visitation Pendente Lite.
The relief sought by the plaintiff, Nancy Lavoie, is pursuant to the provisions of section 466b-59 of the Connecticut General Statutes.[1]
As previously noted, that statute has been the subject of a number of recent court decisions which, [for the most part, had the effect of restricting and qualifying the] interpreted language concerning "any person" in a way that dramatically restricted and qualified the prerequisites for an award of visitation.
In Roth, the Supreme Court held, inter alia, that the trial court erred in awarding visitation rights to a maternal grandmother and aunt of minor children over their father's objection.
While falling just short of declaring Section 46b-59 unconstitutional, the Court held that the decision of a natural parent concerning visitation with third parties is controlling. The Court not only moved away from allowing "any person" from obtaining an order of visitation, it "raised the bar", so to speak, as to all applicants, including CT Page 15201 relatives, in their efforts to gain visitation rights.
The fundamental predicate in Roth is that, absent those essential facts, "forced intervention by a third party seeking visitation is an unwarranted intrusion into family autonomy." Roth, Id., p. 229.
Prior to the holding of the Supreme Court in Roth v. Weston the facts in this case with respect to the provisions of Section 46b-59 would have been deemed satisfied in full and visitation awarded accordingly.
Notwithstanding the holding in Roth, Section 46b-59 is still the law of this state, subject to the severe restrictions and constraints imposed upon its application by the Roth decision.
In Roth, the defendant-father claimed that § 46b-59 violated the rights of parents to raise their children as protected by the due process clause of the fourteenth amendment to the United States constitution and article first, § 8, of the constitution of Connecticut. Roth v. Weston, supra, 259 Conn. 209-10. The Roth court went on to frame the issue in light of prior rulings by the United States Supreme Court and the Connecticut Supreme Court, noting that "[t]he dispositive issue on appeal is whether, in light of the United States Supreme Court decision in [Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49
(2000)], § 46b-59, as interpreted by this court in Castagno v. Wholean, 239 Conn. 336, 339-52, 684 A.2d 1181 (1996), is unconstitutional, either facially or as applied in this case." Roth v. Weston, supra, 209.
Rather than determining whether or not Sec. 46b-59 was unconstitutional, the court elected to determine whether or not it had been unconstitutionally applied — and determined that it had.
In its examination of the statute, the court determined that, implicit in the statute is . . . a rebuttable presumption that visitation that is opposed by a fit parent is not in a child's best interest.
It went on at great length to recognize and give great deference to the constitutionally protected interest of parents to raise their children without interference. Frequently cited was the holding in Troxel v. Granville, 530 U.S. 57, a United States Supreme Court decision which found a Washington state statute very similar to Sec 46b-59 to be facially unconstitutional, as it was applied by the Washington State Supreme Court, for failing to adequately protect a parent's constitutional right to deny visits between his children and their paternal grandparents. CT Page 15202
In Roth, our supreme court revisited its decision in Castagno v. Wholean, 239 Conn. 336, and concluded that the "threshold requirement" for the determination of when a trial court has jurisdiction to entertain a complaint for visitation was insufficient to protect a parent's right to rear one's child and to family privacy and, as a result, Castagno was overruled. That threshold requirement permitted court intervention (merely) upon a showing that the family life of the minor child had been disrupted in a manner analogous to the situations provided for in Sections 46b-56 and 46b-57, General Statutes (e.g. cases involving dissolution or annulment or child custody cases).
Disruption of the family unity was no long enough of a predicate to confer the jurisdictional prerequisite of standing. New and more restrictive jurisdictional prerequisites were to be required before a custody/visitation complaint was to be allowed.
The holding in Roth resulted in a different way of approaching the jurisdictional issues in a visitation matter. The question no longer was "what right does this applicant have to be awarded visitation?", but rather, "what authority does the court have to entertain and grant a petition for visitation?"
In Roth, the court concluded that" there are two requirements that must be satisfied in order for a court: (1) to have jurisdiction over a petition for visitation contrary to the wishes of a fit parent; and (2) to grant such a petition" (emphasis added). Roth v. Weston, supra, 234-35.
They can be described as (I.) Jurisdictional Requirements and (II.) Standard of Proof.
I. JURISDICTIONAL REQUIREMENTS
These "high jurisdictional hurdles", as they are also referred to in Roth, require that the petition for visitation contain the following "specific, good faith allegations"
(1) That the petitioner has a relationship with the child that is similar in nature to a parent-child relationship; and
(2) That denial of the visitation will cause real and significant harm to the child.
"It must be a degree of harm analogous to the kind of harm contemplated by [General Statutes] §§ 46b-120 and 46b-129, namely, that the child CT Page 15203 is neglected, uncared-for or dependent. The degree of specificity of the allegations must be sufficient to justify requiring the fit parent to subject his or her parental judgment to unwanted litigation. Only if these specific, good faith allegations are made will a court have jurisdiction over the petition.
(1) "Parent-like Relationship" requirement.
In Roth the court acknowledged the fact that the plaintiffs (maternal grandmother and aunt) each had an "ongoing relationship" with the children, however the court further found that they ". . . have not shown that they have acted in a parental type of capacity to the children as required under Sec. 46b-59."
There is no doubt, based on the facts as set forth herein above, that the plaintiff; Lavoie, had and has a "parent-like" relationship with each of the two children and that she has acted in a parental type of capacity to these children as required under 46b-59.
(2) Harm Caused by Denial of Visitation.
In Roth the court went on to distinguish the serious harm which would result from the denial of visits by a person having "a close and personal relationship" with the child ". . . as opposed to the situation in which visitation with a third party would be [merely] in the best interests of the child or would be very beneficial." Roth, supra, p226.
The court quickly dispatched the "best interests of the child" standard when no "harm" is alleged, as being" nothing more than a standard which delegates to judges authority to apply their own personal and essentially unreviewable lifestyle preferences to resolving each dispute", citing Rideout v. Riendeau, 761 A.2d 291, 310 (Me. 2000)' Roth, supra, 223.
The Roth court also noted that "[a] more difficult issue is whether the child's own complementary interest in preserving relationships that serve his or her welfare and protection can also constitute a compelling interest that warrants intruding upon the fundamental rights of parents to rear their children. . . . Specifically, we consider whether something less than an allegation and proof in support of abuse, neglect or abandonment will suffice to permit an intrusion." (Citations omitted; emphasis in original.) Id., 225.
In answering that question, the court stated that "the only level of emotional harm that could justify court intervention is one that is akin to the level of harm that would allow the state to assume custody under CT Page 15204 General Statutes §§ 46b-120 and 46b-129 — namely, that the child is neglected, uncared-for or dependent' as those terms have been defined.
In language which seems to contemplate the facts in the instant case, the court in Roth went on to hold, "we can envision circumstances in which a non-parent and a child have developed such substantial emotional ties that denial of visitation could cause serious and immediate harm to that child. For instance when a person has acted in a parental-type capacity for an extended period of time, becoming an integral part of the child's routine, that child could suffer serious harm should contact with that person be denied or so limited as to seriously disrupt that relationship. " Roth, supra, 225-26.
The circumstances envisioned by the justices may not have existed in the Roth case, but they certainly exist in the instant case as established by the evidence and testimony.
The defendant in this case relies heavily on the language in Roth referencing the statutory harm defined in Section 46b-120 and referenced in Section 46b-129, General Statutes. The court in Roth uses "neglected", "uncared for" and "dependent" as defining terms. In her opposition to the visitation sought by the plaintiff the defendant maintained that the plaintiff has failed to prove, by clear and convincing evidence, the children are "neglected", "uncared for" or "dependent."
The definition of "harm" in the Roth case does not require that a child actually be neglected, uncared for or dependent, but rather that the level of harm to which they are subjected "is one that is akin to such harm" (emphasis added). Roth, supra, p. 226.
"We are persuaded, therefore, that an allegation, along with proof thereof, that the parent's decision regarding visitation will cause the child to suffer real and substantial emotional harm likewise presents a compelling state interest that will permit interference with parental rights . . ." (emphasis added). Roth v. Weston, supra, 226.
In her Amended Visitation Complaint dated July 9, 2002, the plaintiff has alleged that "the defendant's wrongful denial of consistent, frequent and regular visitation between Brendan, Jessica and the plaintiff; both children have suffered and will continue to suffer emotional distress and loss of a parental relationship, all contrary to the children's best interest" and that "the denial of such visitation has caused and will continue to cause the children real and substantial harm." (See Amended CT Page 15205 Visitation Complaint, Paragraphs 26 and 26).
Dr. Stephen Herman, a child psychologist testified that while he had not examined either child, based on the established facts concerning the relationship of the parties, the events surrounding the conception and birth of each of the children and the plaintiff's interaction with the children, it was his professional opinion that removal of the plaintiff from the children's lives had, by necessity, caused them harm and would continue to do so. He further testified that absent the restoration of contact there is a potential for future harm.
He characterized the harm he testified about as "significant and substantial psychological damage to [the] children."
The court also heard from Nancy Eiswirth, a licensed clinical psychologist, who testified that in a case where the established facts were that there has been a parental relationship, where the children have been held out to be the children of both parents, with continuous contact and parent-like responsibilities acted out by both parents, there would be potential harm to the children by suddenly having the relationship severed.
Leslie Raider, Family Relations Officer, testified and filed in evidence a written study which she prepared at the direction of the court. She testified that, in her opinion, the children enjoyed a significant relationship with the plaintiff and that a gap in contact with her would cause the children to experience significant loss which could have a traumatizing effect on them.
The defendant, MacIntyre, offered no credible evidence as to why she had concluded that Lavoie should not and would not be allowed visitation with the two children. Based on the evidence and testimony, the court finds that the defendant had become angry with the plaintiff due to the breakdown of their relationship and she elected to deny the plaintiff access to the children as punishment or retribution for the wrong which she perceived the plaintiff had done to her. Little, if any, consideration was given by the defendant to the consequences her denial of visitation would have on the minor children. That, in and of itself, constitutes an abuse of the children.
The court finds that the jurisdictional prerequisites of (1) parent-like relationship and (2) harm caused by denial of visitation have been met by the plaintiff
II. STANDARD OF PROOF CT Page 15206
Once the jurisdictional prerequisites have been met, the court must consider whether or not the applicant has proven them by the highest degree of proof in civil courts — clear and convincing proof. As the court found in Roth, ". . . [O]nce these high jurisdictional hurdles have been overcome, the petitioner must prove these allegations by clear and convincing evidence. Only if that enhanced burden of persuasion has been met may the court enter an order of visitation. These requirements thus serve as the constitutionally mandated safeguards against unwarranted intrusions into a parent's authority." Roth v. Weston, supra, 259 Conn. 234-35.
The court heard the evidence and testimony by both parties and a large number of witness, both fact witnesses and expert witnesses. The court has had the benefit of the memoranda of law provided by both parties and the court has had the input of the guardian ad litem for the children. Additionally, the court has taken into consideration the relevant statutes and practice rules.
The facts of this case are very unique and equally compelling. The plaintiff is a party who has all but given birth to these children, literally, and has given birth to them vicariously, as indicated by the unrefuted facts concerning her involvement with the children before, during and after their births. She is held out and perceived by family, friends, professionals and especially the children themselves as being their parent. No credible evidence was offered to establish that the denial of visits was necessary, warranted or in any way done in the best interests of the children.
The reason those facts are relevant to the issue of burden of proof is indicated by the Roth court's estimation of "what standard of proof must be required in order for the intrusion of this nature to be justified" (emphasis added), Roth, supra, p. 230.
The nature of the intrusion must be ascertained before it can be properly weighed against the constitutional issues at stake. The nature of the intrusion expressly contemplated in Roth is intrusion upon "parental prerogative." The facts in the instant case permit the court to find that the plaintiff. herself, has been an essential member of this family unit from before the birth of the children and that her application for visitation is in fact an attempt on her part to sustain her role as a member of the children's family rather than to intrude upon the family.
The type and nature of the relationship is a critical factor in determining whether the movant has prevailed in her application for CT Page 15207 visitation. As the court has determined in Roth, blood relationship, in and of itself is not enough. Even a grandmother or an aunt cannot expect to meet the Roth standard simply and solely by the fact of their ancestry. However, the court went on to note that "we acknowledge that a person other than a blood relation may have established more significant relationship with a child than the one established by . . . some other relative." ". . . [I]t is not necessarily the biological aspect of the relationship that provides the basis for a legally cognizable interest. Rather it is the nature of the relationship that determines standing" Roth, supra, p. 221.
While the degree of intrusion and the legally cognizable interest and standing are essential to the determination of jurisdiction, they also go a long way in the determination of the applicant's burden and the extent to which she has met it.
Having taken into consideration all of the above, the court finds that the plaintiff has sustained her burden by clear and convincing evidence.
The motion for visitation, pendente lite is granted.
As part of the evidence and testimony before the court Leslie Raider, Family Relations Officer, submitted a written report to the court in which she set forth a recommended visitation schedule to be considered by the court. The court finds that proposed visitation schedule to be appropriate and incorporates it by reference into this order with the following modification:
Thanksgiving Day 2002 visit to conclude at 4:00 p. m. (or other reasonable hour by agreement of the parties) rather than as proposed in the F.R.O. report. In all other respects the proposed visitation schedule is adopted and ordered and shall be complied with until further order of this court.
Should the parties, including the guardian ad litem, mutually agree to stipulate to any changes or modifications to said visitation schedule they are
By the Court,
Joseph W. Doherty, Judge
JUDICIAL BRANCH SUPERIOR COURT — FAMILY DIVISION
Visitation EVALUATION REPORT
__________ MEDIATION REPORT
SUPERIOR COURT DOCKET NO. F.S.U. NO. Danbury 343228 3-20317
Plaintiff: Nancy Lavoie Atty. for Plaintiff: Maureen Murphy
vs. Defendant: Sandy MacIntrye Atty. for Defendant: David Ball
Children: Brendan MacIntrye Atty. for Children: Not Represented DOB 3-5-97 Jessica MacIntrye DOB 6-6-99
___________________ ___________________
 Requested by the Honorable: Deborah Kochiss Frankel (Judge of the Superior Court)
Referral Date: 10-29-01 Continuance Date(s): ______ ______ ______ Completion Date: 5-22-02 Submitted by: Leslie L. Raider (Family Relations Counselor(s))
 RECOMMENDATIONS/AGREEMENTS:
Please see attached report.
 EXCERPT
Recommendations
It appeared that Sandy MacIntrye has been the primary caretaker for the children, but the Nancy Lavoie also has functioned and been presented to the children and society as a parental figure in the children's lives. The dispute between the parties regarding the children appeared to be primarily based on the demise of their relationship rather than on concerns relevant to direct care of the children. The present level of hostility between the parties necessitates a defined schedule of contact to insure that there is consistency in contact and to reduce the likelihood of the children being exposed to arguments between two people that care about them and that they care about.
It is recommended that there be a defined schedule of visitation contact between the children and Nancy Lavoie. It is recommended that the children visit on alternate weekends from Saturday at 9:00 a.m. until Sunday at 6:00 p.m. It is also recommended that minor Monday holidays (Martin Luther King's Day, President's Day, Memorial Day, Labor Day and Columbus Day) attach to the alternate weekend schedule with the return time becoming Monday at 6:00 p.m. It is further recommended that the children visit on alternate Thursday evenings prior to the weekend spent with Sandy MacIntyre from 5:15 p.m. to 7:30 p.m. and on alternate Tuesday evenings following this weekend from 5:15 p.m. to 7:30 p.m. It is recommended that the children spend Thanksgiving Day from 9:00 a.m. to 6:00 p.m. with Nancy Lavoie in even numbered years and that they spend Thanksgiving Day with Sandra MacIntyre in odd numbered years. It is recommended that the children be with Nancy Lavoie each year from December 25th at 1:00 p.m. until December 26th at 6:00 p.m. In addition, it is recommended that Nancy Lavoie be entitled to effectuate three five-day periods of vacation time with the children each year. It is recommended that these vacation times include a weekend when the children would normally be scheduled to be with Nancy Lavoie rather than in addition to those days. It can have the children either on a Tuesday or Thursday evening so that she might schedule vacation time with the children.
Respectfully Submitted,
Leslie L. Raider M.A. Family Relations Counselor CT Page 15209