[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
History and Findings of Fact:
As stated so well by Attorney Susan M. Connolly, former Guardian Ad Litem for the minor child, in a Memorandum of Law dated October 31, 2002, "[t]his is a family law case rivaling the tortuous history of the Bleak House "Jarndyce Case." This case was referred to the RFTD on January 3, 2002 by the Judicial District of New London. The referral was accepted on March 7, 2002. The matters before this court are defendants' Amended Motion to Modify Custody dated May 3, 2003 (motion #243) and plaintiff's Motion to Reopen and Modify Judgement and Reinstate Child Support Order dated October 23, 2001 (motion #211). The case was heard by the RFTD on December 16-18, 2002. The parties were given until January 7, 2003 to submit briefs and this decision followed.
The tangled and complicated history of this case is described below. The plaintiff and the defendant father were divorced in Rhode Island on January 21, 1992. The plaintiff was awarded sole custody of the minor child, Ashley Foster (now known as Ashley McAndrew), date of birth August 28, 1990. Visitation was initially denied to the father because he failed to appear in court at the time of the dissolution. The Rhode Island court later entered a consent decree, vacating the dissolution orders regarding custody and visitation but confirming the dissolution. In the consent decree the defendant father was granted reasonable rights of visitation supervised by the paternal grandmother, Gail Foster. Additionally, the co-defendants/paternal "grandparents were granted their own separate visitation for specific dates and times. At the time of the consent decree the plaintiff resided in Rhode Island, the defendant father in Alabama and the paternal grandparents in New Jersey.
In February 1995, the plaintiff called the child abuse hotline and reported that Timothy Foster, Jr. had sexually abused Ashley. It appears that the accusations were initially against another child attending the same nursery school; Ashley later reported that her father had touched CT Page 809 her. The visitation during which the sexual abuse was alleged to have taken place was supervised by the paternal grandparents and a Rhode Island Sheriff who videotaped the visit. A Rhode Island grand jury returned a no true bill on a 1st degree Child Molestation indictment. During the hearing before the RFTD on December 16-18, 2002, Dr. Ronald Anderson, Ph.D., testified that it would be unusual for a child of Ashley's age (3) to have such vivid memories of the alleged abuse. Given the supervision of the visit, the videotaping of the visit by a sheriff and Dr. Anderson's testimony the court finds no basis for believing the allegations of abuse have any basis in fact. The court would note that these allegations were made just prior to an expansion of the defendant's visitation with Ashley. This is a pattern that has been repeated frequently over the last 9 years.
In subsequent years, Ashley made additional allegations of sexual abuse. One was against a janitor of the school she attended and the second was against a male classmate. Interestingly enough, Miss McAndrew failed to press charges against either of these alleged perpetrators. Additionally, she did not know at the time of trial if the classmate still attended the same school with her daughter. Miss McAndrew testified that she herself was sexually abused as a child at age 11 and again at age 21 or 22. Neither of those incidents was ever reported to the police.
As a result of the sexual abuse allegation, visitation disputes continued. During a hearing before the Family Court in Rhode Island, Judge Paul Suttell stated
 "[t]his court believes that Miss McAndrew has abused and misused the system, the legal process throughout my involvement with this case. She's compromised her own attorney at least two previous ones had to withdraw because of perceived confliction with rules of professional conduct that Mrs. McAndrew has done intentionally, thinking there would be some advantage by bringing in new counsel at that appropriate point. I'm reading, so these are notes that I have from the last hearing. Miss McAndrew has undermined the spirit, if not the letter, of virtually every court order regarding visitation. "
(Defendant's Exhibit D, p. 12, 13).
 "Without seeking court review, Miss. McAndrew, as an excuse to deny the Fosters Court ordered visitation, she subsequently perjured herself in Court by testifying that Dr. Berman did not interview Ashley at all on December 12th. I don't believe Miss McAndrew had any intention of complying with that order, not on December 24th when she agreed to it. CT Page 810 Not on December 2nd when she saw Dr. Berman and not on December 26th when the Fosters traveled to Rhode Island to pick up Ashley. I further believe she was well aware of the order and is in willful contempt of the orders of this court. This is not the first time Miss McAndrew has disregarded a court order. Throughout my involvement with this case she has consistently disregarded Court orders, compromised her own attorneys and generally has abused the legal process. She's demonstrated selective memory, shaded the truth and outright lies on the witnesses stand. Some of her performances would have been worthy of an academy award if they had not been so transparent."
(Defendant's Exhibit D, p. 14).
However, despite Judge Sutell's finding of contempt, he stated "whether Miss McAndrew herself, and let me say, but for the relationship with the child's father and the child's grandparents, on father's side, there's been little testimony before this court that would suggest to the court that she's not a good mother." (Defendant's Exhibit D, p. 7)
The Rhode Island Court also found that Miss McAndrew sabotaged a plan by one of Rhode Island's psychologists to help repair the relationship between Ashley and her father in a safe and neutral setting. The family court, thereafter, found Miss McAndrew to be in willful contempt of court and ordered her to be incarcerated in the Adult Correctional Institute for 5 days and suspended the incarceration until June 10 1996, to allow the mother to be with the child during Ashley's tonsillectomy. The judge ordered her to report back to the court on June 10th, 1996 and to serve until June 14, 1996. Miss McAndrew failed to appear in court on June 10, 1996. A body attachment was issued commanding the she be taken into custody. Donanova McAndrew took the minor child and left the state of Rhode Island in June 1996, moving to Connecticut.
When Miss McAndrew fled the jurisdiction of Rhode Island, she failed to tell the paternal grandparents and the child's father where she was going or where they could reach her for future visitation. Miss McAndrew and her family have lived in Griswold, Yantic, Jewett City, Plainfield and currently in Preston, Connecticut. At some point she changed Ashley's last name from Foster to McAndrew. She testified she did this at Ashley's request when she was 8 years old despite a court order not to change the child's name (Defendant's Exhibit G). She is currently employed at Foxwoods Casino and resides with Ashley, Joseph (her son from a subsequent relationship) and her mother.
The paternal grandparents eventually located their granddaughter by hiring and paying for a private detective. In September 1999, the CT Page 811 paternal grandparents brought an action in Connecticut to enforce their visitation rights with Ashley.
In November 1999, Judge Martin entered an order that Ashley was to call her paternal grandparents every Sunday at 4:00 p. m. Gail Foster testified at trial that only 2 of the 20 court ordered calls were received. On January 10, 2000, a stipulation was approved and ordered by Judge Martin that transferred the case to the Wind ham Judicial District, ordered specific visitation and ordered psychological evaluations for all parties by Dr. Anderson. On March 13, 2000, the case was transferred to Putnam and Judge Potter approved a stipulation providing the grandparents with visitation every third Sunday from 9:00 a.m. to 6:30 p. m.
Miss McAndrew relocated from Plainfield, Connecticut to Preston, Connecticut in February 2000 without prior permission of, or notification to, the court. The paternal grandparents filed a motion for contempt for her relocation in violation of the court order, failing to provide visitation as agreed and failing to submit to the psychological examination.
On May 26, 2000, the plaintiff filed a motion to modify the Rhode Island decree to either terminate the grandparents' visitation or provide for supervised visitation. On June 26, 2000, the parties entered into another agreement, approved by the court, stipulating that Miss McAndrew would meet with Dr. Anderson on July 23, 2000.
On October 4, 2000, the defendants again moved for a finding of contempt for denial of visitation rights. They were supposed to have visitation every third Sunday commencing March 18, 2000. Gail Foster testified in December 2000 that she and her husband exercised three visits between March and December. The first visit was in March 2000 when they met Ashley at a McDonald's in Plainfield, the second visit they took Ashley to a movie, and the third occurred in April of 2000 during which time they took Ashley to the beach in New London, Connecticut. Miss McAndrew advised Dr. Anderson that she allowed the visits to go on until nine-year-old Ashley stated "I'm not taking it any more — I'm not going on these visits."
On November 3rd 2000, the grandparents moved for an order transferring custody to them, predicated upon the result of the psychological evaluation. Due to the urgency of the situation, as expressed in Dr. Anderson's psychological evaluation, and the alleged violation of the orders of visitation, Judge Foley scheduled this matter for trial on December 5th 2000. Judge Foley heard testimony over three days. The court heard the testimony of Dr. Ronald Anderson, Dr. Deborah McGeehan, the CT Page 812 parties, and the recently engaged psychiatrist, Walid Jaziri, M.D. (who is claimed to be the plaintiffs and minor child's present therapist). After Dr. Jaziri testified, the court continued the case until January 12, 2001 to permit the litigants to meet with Dr. Jaziri in a controlled setting, to allow Ashley to meet her Father, and to allow Ashley to meet with her grandparents in the presence of her mother. Gail Foster described the visit, after court, as being traumatic for Ashley. She hid her head in her jacket when her father entered the room. Ultimately, Dr. Jaziri recommended a reunification of Ashley and the defendants should take place gradually over a period of 5 years. This was not acceptable to the Fosters. The trial resumed on January 12, 2001 and the case concluded all testimony on that date.
Judge Foley issued his decision on February 14, 2001. Judge Foley found that all of the professionals and clinicians agreed it was in the best interest of the child to have at least a visiting relationship with her paternal grandparents. The court specifically found that a relationship with the paternal grandparents was in the child's best interest. The court found that Miss McAndrew utterly and willfully violated the orders of the Rhode Island Family Court and the orders of the Connecticut Courts with respect to visitation. Judge Foley ordered that Donanova McAndrew be committed to the custody of the Commissioner of Corrections for a maximum period of 6 months for her consistent willful and flagrant violation of court visitation orders. The execution of the sentence was suspended and was to be reviewed on September 14th, 2001, or upon any earlier violation of court orders. The court also imposed a fine on the plaintiff in the amount of $3,800 to be paid to the parental grandparents at the rate of $100 per month commencing March 15, 2001, and continuing monthly thereafter. The court specifically found that the paternal grandparents were suitable and worthy persons to provide for the care and custody of the minor child and ordered further review of the case on September 14th, 2001. The child was ordered to remain with the plaintiff mother and the grandparents were ordered to have specific dates and times of visitation in the following months: February 2001; March 2001; April 2001; May 2001; July 2001; August 2001. The court also ordered that the child's father, Timothy Foster Jr., could visit with the child in the presence of the grandparents beginning July 1st 2001.
At the instant trial, Gail Foster testified that the court-ordered visits were fraught with problems. The first visit in February was for a weekend at the home of a Foster family friend. Ashley arrived with a padlock on her suitcase, a key around her neck and refused to open the suitcase in the presence of her grandparents or take the key off her neck. Mrs. Foster testified she was afraid the child would strangle while sleeping with long hair and a string with a key around her neck and CT Page 813 claimed to have gently persuaded Ashley to take the key off her neck. Ashley alleged that her grandmother threatened to cut her hair off unless she removed the key and unlocked the suitcase. Mrs. Foster described Ashley as having a sad face when she was picked up for the March 2001 visit. In April 2001, the visit was a relatively successful visit during which Ashley reportedly had a good time. The May 2001 visit was canceled by the Fosters at the last minute because they were caught in Memorial Day traffic and anticipated arrival in Connecticut hours after they were scheduled. The visit in June 2001 was supposed to be for a week with the Fosters at their home in New Jersey. The Fosters waited at the pickup point for two hours before they. began to leave. However, as they were pulling out of the parking lot of the pick up location, they saw Miss McAndrew's car. They pulled back into the lot and discovered that Ashley was hysterical, screaming and crying that she didn't want to go. Mr. and Mrs. Foster were both asked by Miss McAndrew to approach her car and try to calm Ashley down. During Mrs. Foster's attempt, an altercation erupted between grandmother and mother, each claiming the other initiated the physical assault. Miss McAndrew called the police who ultimately escorted Ashley to the Foster's car and made no arrest. After the trauma of the pick up, Mrs. Foster described the visit as pleasant; it included a trip to Liberty Island, where Ashley had never been. During the drop off for this visit, Ashley had a number of items to carry to her mother's car. Rather than allow her daughter to be assisted, Miss McAndrew instructed the Fosters to drop the things in the street and leave. This was the last time the Fosters have seen Ashley.
The court notes that the visits between Ashley and her Father were to have begun in July 2001 pursuant to Judge Foley's order. The Fosters drove to the agreed pick up point for the July visit and waited for several hours. They attempted to call the plaintiff but the plaintiffs cell telephone went unanswered. In August 2001, the Fosters again waited for several hours and called Donanova McAndrew's cell telephone to no avail. They drove by Miss McAndrew's home as they were leaving and saw Ashley in the front yard in a bathing suit with a hose in her hand. Gail Foster wanted to stop and see why Ashley wasn't ready for the visit, but Timothy Foster Sr. was fearful of another ugly confrontation with Miss McAndrew with police involvement and they simple drove by.
Miss McAndrew testified that she complied with the court order because she had the six months incarceration hanging over her head and she was afraid. At some point in time she claimed that Attorney Robert Young and Dr. Jaziri told her the visits with the Fosters were not in Ashley's best interest so she terminated the visits at that point. She was unable to offer any explanation why she thought a court order could be changed by Dr.Jaziri except to comment that Dr. Jaziri was a mandated reporter of CT Page 814 child abuse.
The paternal grandparents are semi-retired and currently live in a 2-bedroom villa in Venice, Florida. Ashley's father, Tim Foster, Jr., currently resides in Alabama with his second wife.
On August 15, 2002, a hearing was held before Judge Robert I. Berdon. At issue was the plaintiffs Motion to vacate the incarceration ordered by Judge Foley. Testimony from Dr. Walid Jaziri, M.D. was heard as to the impact of mother's incarceration on the minor child. On August 15, 2001, Judge Berdon issued the following orders:
 That it is not in the best interest of the child to have her mother incarcerated; That Attorney Traysman is appearing on behalf of all three defendants (Timothy Foster, Sr., Timothy Foster, Jr., and Gail Foster);
 The parties are withdrawing the pending appeal in this matter, and the Court will send that withdrawal directly to the Appellate Court on behalf of the parties;
 The Court is vacating the previous court orders that the plaintiff be incarcerated for 6 months;
 The Court has approved the stipulation of the parties that the Court's previous order that the plaintiff pay $3,800 be reviewable de novo and suspended until it is reviewed by the Court at the time of trial;
 The Court grants the AMC's motion to withdraw, and releases Attorney Robert Young from any further role in this case,
 The Court orders that Judge Foley's letter to Justice Berdon is made part of the file;
 The Court orders that this file be placed on the Monday August 20, 2001 short calendar in New London for hearing on the following two issues:
 1.) Whether this case is to be referred to the Regional Family Trial Docket, and if there is a referral, what issues or motions are being referred? Motion #127 #161
 2.) Whether an updated psychological evaluation shall be ordered and, if so, by whom it should be done? Motion #154
On August 20, 2001, Judge C. Ian McLachlan ordered that Dr. Ronald CT Page 815 Anderson conduct an updated evaluation in the case. Plaintiff filed an objection to this order on August 24, 2001.
On October 18, 2001, Judge James Devine denied plaintiffs Motion for Contempt (for failure to pay child support), denied without prejudice defendant's Motion for Protective Order and Sanctions, and ordered that the minor child was to continue to see Dr. Jaziri in therapy. Judge Devine ordered counsel to submit briefs regarding the preclusion of Dr. Jaziri's testimony in his capacity other than as the minor child's therapist, in response to the GAL's Motion to Compel. Finally, Judge Devine ordered the minor child to be brought to Attorney Connolly's Office at 4:15 p. m. on Tuesday, October 25, 2001, and denied plaintiffs Motion to Compel In Limine P.J. and Motion for Removal of GAL.
Judge Devine granted Attorney Susan Connoly's (GAL) Motion to Withdraw on January 3, 2002 and ordered that "[n]o party shall file any motion pending final hearing without permission of the court."
On April 24, 2002, at the RFTD, Judge Stephen Frazzini ordered that there should be an updated report of the minor child from Ronald Anderson, Ph.D., the previous court-appointed evaluator. All parties were ordered to cooperate for the evaluation to be completed. The evaluation was to be completed by Dr. Anderson within a month from the date of the order at his (Dr. Anderson's (scheduling convenience. The AMC, Attorney Kristen Quaratella, was to make arrangements for the appointment, notify the parties and, so long as she remained willing, transport the minor child to and from the appointment with Dr. Anderson. The AMC was also responsible for notifying the Court Officer as to when the appointment with Dr. Anderson would take place and the progress of the evaluation. Payment of Dr. Anderson's fees was to be addressed at the time of the court's final orders. If Dr. Anderson required payment before completion of the report, the attorney for the minor child was ordered to notify the court.
On June 7, 2002, Judge Stephen Frazzini, ordered a custody evaluation and psychological evaluation of the minor child, Ashley, to be performed by Nancy Randall, Ph.D. If she was unavailable, Susan Berry, Ph.D., then Anne Phillips, Ph.D., were to be contacted, in that order of preference, to conduct the evaluation. The evaluation was to include interactionals between Ashley and her parents and her paternal grandparents.
The reason the identity of the evaluator changed was due to Ashley's refusal to cooperate with Dr. Anderson or even speak to him. When Miss McAndrew was questioned why Ashley refused to talk to Dr. Anderson she explained that he wasn't friendly towards Ashley and that Ashley said he CT Page 816 was "cold." She insisted that "Ashley has a mind of her own" and Ashley is frustrated that she keeps telling her story over and over and no one listens to her. Miss McAndrew testified that some of Ashley's reasons for not cooperating sounded OK to her and admitted that she failed to tell her daughter the evaluation by Dr. Anderson was court-ordered. Miss McAndrew testified the only way she could get Ashley to cooperate with Dr. Anderson would have been to physically force her, which was something she was not willing to do. When the plaintiff was questioned about teaching her daughter respect for the law, when she violated court orders, Donanova McAndrew explained that she was putting her daughter's best interest in front of what was happening in court and claimed that her former in-laws lied about their visits with Ashley. Miss McAndrew portrayed the visits as horrible ordeals for Ashley where the child was threatened as well as forced to listen to her grandparents attack and criticize her mother.
On July 27, 2002, Judge Frazzini issued another order stating that Dr. Berry would perform the evaluation of the minor child and that each party would be responsible for 25% of Dr. Berry's fees.
On August 8, 2002, Judge Frazzini found that an updated psychological evaluation was necessary, denied the defendant's Motion for Reconsideration (of the division of Dr. Berry's fees (and granted in part the plaintiffs Motion for Reconsideration (of Dr. Berry's fees). The paternal grandparents were ordered to advance the plaintiffs share of Dr. Berry's fee and a schedule for repayment was established. The court noted that the plaintiff had a pending motion to reinstate child support and reserved decision whether the division of Dr. Berry's fee would be impacted by the decision on that motion. Around the same time, the State of Rhode Island began proceedings on the body warrant issued when Miss McAndrew fled that state. She testified that she had withdrawn $10,000 from her 401k account to retain an attorney in Rhode Island, while telling the Connecticut court she had a reduction in income and couldn't pay the $750.00 for Dr. Berry's retainer. The plaintiff testified that she paid her Rhode Island attorney before the Connecticut order to pay for Dr. Berry's fees.
On August 19, 2002, Judge Frazzini issued a Memorandum of Decision on plaintiffs motion to dismiss and motion to strike defendant's amended motion to modify custody. The plaintiff moved to dismiss the present action on the grounds that the defendants lacked standing and/or the court lacked subject matter jurisdiction as a result of the recent Connecticut Supreme Court ruling in Roth v. Weston, 259 Conn. 202,789 A.2d 431 (2002), and it's progeny. Judge Frazzini held that the pleading at issue in the present case alleged that the plaintiff is an CT Page 817 unfit parent, and the standards set forth in both Roth and Crockett v. Pastore, 259 Conn. 240, (2002), apply only when parental fitness is not an issue.
The plaintiff also moved to strike the amended motion for custody on the ground that the defendants failed to state a legally sufficient claim upon which relief could be granted. The plaintiff argued that the amended motion to modify custody should be stricken because (1) it did not allege a substantial change in circumstances; (2) was not in compliance with Practice Book § 25-26(e);[1] and (3) the case referred to in the motion to modify, Savage v. Savage, 25 Conn. App. 693, 596 A.2d 23
(1991), was named without citation and was not remotely related to the present case. Judge Frazzini agreed with the defendants that their allegations were sufficient despite the lack of the nomenclature "substantial change in circumstances."
Judge Frazzini found the dispositive factor in resolving the two motions at issue before him was that the pleadings raised a facially valid claim by defendant father seeking to enforce his court-ordered right to supervised visitation of his minor child. The amended motion to modify custody alleges that the defendant father
 "intended to visit with the child in the presence of his parents . . . and to date has had almost no contact with his daughter since she was very young, as the plaintiff mother has intentionally interfered with his relationship with the minor child Ashley."
"Troxel, Roth, and Crockett pose no constitutional impediment to a court ordering one parent to provide the other parent with access to their minor child. None of those cases identify any constitutional basis for limiting a court's ability to prescribe where or how such visitation should occur. When, as here, a court has ordered supervised visitation, this court can thus find no constitutional barrier to a court prescribing that non-parent third parties, such as the grandparents here, provide such supervision. " Judge Frazzini found that "the claims of the paternal grandparent codefendants, on the other hand, stand on shakier ground and survive solely because it appears, from the pleadings, that the father is also seeking to vindicate his own rights. The existence of a legitimate custody controversy between mother and father allows the paternal grandparents to remain in this action to seek custody. If his claims prove to have no bona fides, as the plaintiff asserts in her briefs, the grandparents' request for custody may belong elsewhere." See Foster v. Foster, MEMORANDUM OF DECISION RE: Plaintiffs Motions to Dismiss and Strike (#'s 234 and 244 (dated August 19, 2002, pp 13-16. CT Page 818
Dr. Susan Berry, Ph.D., testified at trial that since Dr. Anderson's evaluation two years ago, Ashley has clearly seen significant progress in school, both academically and socially, and in the development of her artistic talent. Dr. Berry did not find Ashley to be learning disabled in any way, or to have any serious educational problems. It was clear to Dr. Berry that Ashley was a bright, talented, articulate, and well liked young lady who experiences a great deal of support and love for, and from, her home and school environment.
Dr. Berry testified that Ashley is fearful of her Father and believes that her grandparents do not truly like her and, most importantly, that they do not respect her mother. Dr. Berry believed that Ashley's perception of the Foster's lack of respect for her mother is an accurate one. Dr. Berry found it likely that Ashley has heard negative comments about her Father and grandparents from her mother, and negative comments about her mother from her paternal grandparents. She testified that Ashley clearly identified with her mother and views her family to be her mother, half-brother and maternal grandmother. Dr. Berry noted that Ashley is now an adolescent and a rather assertive one. Visitation plans will fail if she feels forced to be with people who do not respect her mother. During her second interview with Dr. Berry, Ashley presented her with the "Long Island Sound 2003 Calendar" which is the result of an art contest sponsored by the Long Island Sound Foundation and is composed of award-winning drawings by students from all over Connecticut. Ashley's drawing is depicted on the page for the month of January and she was one of only fourteen students from the state whose artwork was chosen for the calendar.
As Ashley grew less guarded with Dr. Berry she admitted that she was very stressed out about the current evaluation process. She stated she believed that Dr. Anderson thought she was retarded and when asked why she thought that, Ashley stated her mother came home one day crying, stating that she did not know why Dr. Anderson thought Ashley was stupid. Then Ashley told Dr. Berry she is especially stressed that the Fosters might try to take her away from her mother. When asked why she might think that, Ashley stated that they often threatened that she was going to live with them and never see her Mom again. Ashley claimed she is "shocked" that the Fosters are her grandparents because they often insult her and her mother during her visits with them. Ashley claimed that it is "Gail" that insults us the most. Dr. Berry obtained information from a number of collateral sources. She spoke to Mrs. Frechette, Ashley's fifth grade teacher. Mrs. Frechette stated that Ashley is a great child who tried very hard to do well in school. Mrs. Frechette stated that Miss McAndrew was very receptive to working on some new ways to help Ashley achieve her potential, and was very cooperative CT Page 819 with the school. She noted that she was impressed with the fact that Ashley never watched junk television, like many other children. Ashley was described as a child who has a very visual and verbal learning style. Mrs. Frechette stated that Ashley's achievements in art are astounding.
The school psychologist; Jane Shea, reported that, in the fourth grade, Ashley appeared sad, worried about the situation with her grandparents, and seemed to have some social and attention problems. Mrs. Shea corroborated Mrs. Frechette's view that Ashley experienced a dramatic change during fifth grade last year. She reports that at that time Ashley's art talent became a focus for all involved with her, a situation that resulted in a boost to Ashley's level of self-esteem. Mrs. Shea stated that Ashley's relationship with her mother is not a traditional mother-daughter one, and noted that Ashley can adopt a rather adult like posture, even with her mother. She reported that Ashley has always spoken fondly of her maternal grandmother. The five teachers who currently teach Ashley in the Preston Plains Middle School unammously agreed that Ashley is a wonderful student who is well liked by both her teachers and her peers.
Dr. Berry found that Miss McAndrew had made some very positive and dramatic changes over the past two years. She testified that Miss McAndrew is "a competent mother who works hard, both for her children and to spend time with them. She knows her children well and, while she may be "rough around the edges," she is a loving, nurturing, and caring mother who supports her children's interests in whichever way she can, even if that way cannot be a financial one." (AMC Exhibit M-I, p. 39)
Despite the fact that he has not had a visit with his daughter in approximately five years, Timothy Foster Jr. told Dr. Berry that he is "done with visits with his daughter." During his testimony at trial, he admitted that the last time he spoke to Ashley was five years ago and that the last time he saw her was three years ago for fifteen minutes. Mr. Foster Jr. admitted he had an alcohol and drug problem while he and Miss McAndrew were together and that there were incidents of domestic violence as well. Since the divorce, he has never seen Ashley unsupervised. He was arrested in the Rhode Island courthouse on allegations of sexual abuse of his daughter and vehemently denied any wrongdoing. He admitted he had been convicted of domestic violence eleven years ago in an incident during which Ashley was injured. He has been with his present Wife for ten+ years and has been drug and alcohol free. His employment up until March 2002 was as a truck driver and, as part of his employment, he undergoes periodic drug testing, all of which confirmed his sobriety. He is currently employed by Jones Trucking in CT Page 820 Alabama as a "spotter" for moving trucks.
During his interview with Dr. Berry, and while testifying before the court, Mr. Foster Jr. gave the impression he had little involvement in the fight between his former wife and his parents. Timothy Foster, Jr. refused to meet with Dr. Berry for more than one meeting and provided the evaluator no documentation to verify his statements to her. When the evaluator wrote to Mr. Foster, Jr. about his failure to return the Parenting History Survey, it was sent back in an envelope imprinted with his present Wife's business address. He failed to return the evaluator's engagement letter. His mother even stated to Dr. Berry "[I]f you knew my son you would know why I want to make the appointments for him" (Attorney for the Minor Child, Exhibit M-1, p. 24).
When he was asked why he has not visited with Ashley more frequently he stated his ex-wife has interfered with visitation and tried to have him arrested. He testified he has incurred legal fees of $32,000 in the past 3 years (Defendant's N).
Dr. Berry found Timothy Foster Jr. to be a bit of a "dark horse" in this race (AMC, Exhibit M-1, p. 39). She found that his parents micromanage his life and his problems and found it hard to believe he is actually Ashley's father? He appeared to have no problems dismissing his lack of awareness of the problems between his parents and his former wife with his statement, "I was in a whole other state!" Unfortunately, it appears to Dr. Berry and this court that Mr. Foster Jr. has led a life of people taking care of him and helping him out of trouble. Dr. Berry had no way of knowing to what extent that still continues, and so she had no basis for recommending that he be one of Ashley's primary caretakers. The court would note that Mr. Foster, Jr. has had little contact with Ashley since she was very young and that he failed to attend the first day of the trial. No evidence was presented to the court that Tim Foster, Jr. sent his daughter letters, holiday or birthday presents, or even attempted to make telephone calls to Ashley. The court finds that Mr. Foster, Jr. and Ashley are essentially strangers and notes that in the Defendant's Amended Claim for Relief he is seeking joint custody of Ashley with the co-defendants, his parents, with primary residence with his parents. The court seriously doubts the amount of joint parenting possible with the suggested custody arrangement as the Foster Sr.'s live in Venice, Florida and Tim Foster, Jr. resides in Alabama. Essentially, the Fosters are asking this court to wrench a well-adjusted child out of the arms of the only family she has ever known and place her with grandparents she sees as hostile and a father she doesn't really know and is frightened of. The court finds no credibility in Tim Foster, Jr.'s claim that he wants custody of Ashley and the court believes that this CT Page 821 custody battle is really between the Foster Sr.'s and Miss McAndrew.
Dr. Berry's evaluation of the Foster Sr.'s was hampered by: their refusal to meet on more than one occasion; a dispute over the signing of the evaluator's engagement letter; a dispute over the evaluator's fees; and a threat that they would be contacting their attorney to file a motion to curtail the current evaluation (AMC, Exhibit M-1, p. 25). Dr. Berry's evaluation of the Fosters did not include interactives because Ashley refused to meet with her grandparents or father. Dr. Berry found Gail Foster to have above average intelligence, limited insight and generally adequate judgement. Dr. Berry's evaluation of Timothy Foster, Sr. found his mood to be irritable and angry at times, above average intelligence and limited insight with less than adequate judgement. He appeared to be an "individual who needs to feel he is in control and will go to great lengths to obtain the control he requires" (AMC, Exhibit M-1, p. 29). Dr. Berry believed, having personally observed Timothy Foster, Sr.'s "quick flare up to anger," that he contributed to the trauma of the transitions for Ashley (AMC, Exhibit M-1, p. 39).
As for visitation, the codefendants allege no parent-like relationship with the minor child, as would be necessary for them to obtain court-ordered visitation against the wishes of a fit custodial parent. Despite the existence of prior court orders granting them visitation rights, the well-reasoned opinion of Judge Resha in Buchalter v. Buchalter, Superior Court, Judicial District of New Britain, docket number FA99-0493218S (February 8, 2002), suggests that Roth overrides prior court orders granting visitation rights to non-parent third parties against the wishes of a fit custodial parent; the plaintiff has, moreover, moved to modify those orders in accordance with Roth. Even a showing that the plaintiff mother is an unfit parent will not necessarily result in an order that the codefendants obtain visitation of the minor child, as the court would, upon a finding of unfitness, first have to determine custody.
Issues:
1. Does the court have jurisdiction over the claim of Gail and Timothy Foster, Sr. for custody and/or visitation of their granddaughter, Ashley McAndrew, post Roth V. Weston, 259 Conn. 202, 789 A.2d 202 (2002)?
2. Is it in the best interest of Ashley McAndrew to transfer custody to her father, Timothy Foster, Jr.?
Discussion:
CT Page 822
Issue 1: "Subject matter jurisdiction involves the authority of a court to adjudicate the type of controversy presented by the action before it." Amodio v. Amodio, 247 Conn. 724, 727, 724 A.2d 1084 (1999). "It is axiomatic that a party must have standing to assert a claim in order for the court to have jurisdiction. " Ganim v. Smith Wesson Corp. ,258 Conn. 313, 346-47, 780 A.2d 98 (2001).
 Standing focuses on whether a party is the proper party to request adjudication of the issues, rather than on the substantive rights of the aggrieved parties. . . . It is a basic principle of law that a plaintiff must have standing for the court to have jurisdiction. Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy.
(Citations omitted; internal quotation marks omitted. (Id. at 347. "If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause." (Citations omitted; internal quotation marks omitted. (Roth v. Weston, supra, 259 Conn. 219.
In the recent decision in Roth v. Weston, 259 Conn. 202, 789 A.2d 431
(2002), the Connecticut Supreme Court held that in view of the fundamental constitutional right of parents to the "care, custody and control of their children"; Id. at 216; nonparents seeking court-ordered visitation against the wishes of a fit custodial parent must allege and prove a relationship with the child similar in nature to a parent-child relationship and that denial of visitation will cause real and significant harm to the child. The defendants, on the other hand, argue that the court has subject matter jurisdiction because the plaintiff is not a fit parent, and that the fundamental right of a parent to raise his or her child applies if, and only if, the parent is a fit parent. The defendants also argue that Roth v. Weston is inapplicable in the present case for the following reasons: they have already been granted visitation; a parent's fundamental right to raise his or her child as that parent sees fit does not apply to a claim for custody of a child under Conn. Gen. Stat. Sec. 46b-56b; and, factually, the case before the court is distinguishable from Roth in that it does not involve an intact family relationship or an initial request for visitation.
The court disagrees with the defendant's argument that the prior decision of the Rhode Island court is controlling and makes Roth inapplicable. Judge Foley's decision may have found that the Fosters were "suitable and worthy persons to provide for the care and custody of the CT Page 823 minor child." This finding is far short of a finding that the Fosters and Ashley have a "parent-child like relationship" as required by Roth. The Foster, Sr.'s have not seen Ashley in approximately 18 months and visits with her prior to that time were sporadic at best. Dr. Berry clearly testified at trial of this matter that Donanova McAndrew, despite her faults, was not an unfit mother. Dr. Berry's report clearly states that Ashley is frightened of her father and considers her mother, half-brother and paternal grandmother to be her family. Additionally, Ashley, currently 12 years old, does not want to visit with the Fosters, much less live with them as a result of their constant criticism of her mother. Despite the evaluation of Dr. Ronald Anderson finding Donanova McAndrew an unfit parent, he testified that a lot can happen in two years of the life of a child and the recommendation of a current evaluator would be preferable to the one he conducted two years ago.
The Supreme Court held in Roth that "any third party, including a grandparent or a great-grandparent, seeking visitation [under General Statutes § 456b-59] must allege and establish a parent-like relationship as a jurisdictional threshold in order both to pass constitutional muster and to be consistent with the legislative intent." The court finds that the constitutional protection afforded by Roth v. Weston to a parent-child relationship applies equally to custody actions under General Statutes §§ 46b-56 and 46b-57. Judge Frazzini found, in his Memorandum of Decision, based on the plaintiffs Motion to Dismiss, that "[a] close reading of Roth v. Weston shows that the Supreme Court considered the possibility that finding General Statutes § 46b-59
unconstitutional on its face would lead to problems interpreting §§46b-56 and 46b-57 because the same issues might arise under those statutes as well. See Roth v. Weston, supra, 233. The court thus agrees with the plaintiff regarding the interrelationship of the statutory scheme of these three statutes and would apply the Roth standard under General Statutes §§ 46b-56 and 46b-57 whether a non-parent seeks visitation or custody." (Foster v. Foster, 2002 Ct. Sup. 10460, p. 10463-4).
The rationale of both Roth v. Weston and its precursor in the United States Supreme Court, Troxel v. Granville, 530 U.S. 57 (2000), was the presumption of parental fitness:
 "We conclude that the statute is unconstitutional as applied to the extent that the trial court, pursuant to the statute, permitted third party visitation contrary to the desires of a fit parent and in the absence of any allegation and proof by clear and convincing evidence that the children would suffer actual, significant harm if deprived of the visitation. CT Page 824
Roth v. Weston, supra, 259 Conn. 205-206.
Accordingly, so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children. Troxel v. Granville, supra, 530 U.S. 68-69. The courts have long sanctioned intrusions on a parent's fundamental rights of care and custody of their children upon sufficient demonstration overriding that presumption.[2]
The custody evaluator appointed by the Court, Dr. Susan Berry, Ph.D., testified that despite all of Miss McAndrew's problems, she is not an unfit parent and Ashley has made remarkable progress in the two years since Dr. Anderson's evaluation.
In a case similar to the one before the court, Clements v. Jones,71 Conn. App. 688 (2002), "[t]he defendant, Loretta Jones, the mother of a minor child, Devon, appealed from the judgment of the trial court awarding visitation to the plaintiff, Joann Clements, the paternal grandmother, pursuant to General Statutes § 46b-59. The defendant claimed on appeal that the court improperly (1) violated her fourteenth amendment right to family privacy by requiring her to make her child available to the plaintiff and (2) applied § 46b-59 because the plaintiff otherwise had access to her grandchild. We reverse the judgment of the trial court." Clements, supra, p. 688-689
The following facts are relevant to the case before the court: "The defendant and Allen Spears, the plaintiffs son, were the parents of the minor child. The defendant and Spears, who never married, separated after the birth of the child. The child lived with and continued to reside with the defendant. The plaintiff had regular contact with the child since birth, in the course of baby-sitting, overnight visits at her home, and driving the child to and from school." Clements, supra, p. 689
"The plaintiff filed an application seeking visitation with the child. The plaintiff, and members of her family, also filed numerous complaints with the department of children and families, alleging that the defendant had neglected or abused the child. Spears filed a petition for custody of the child. The plaintiffs application and the petition filed by Spears were consolidated, and the plaintiff and Spears were treated as coplaintiffs. After a hearing, the court entered an order granting the plaintiff visitation rights on Wednesdays before and after school, subject to the defendant's vacation schedule and later modification. " CT Page 825 (Clements, supra p. 689)
"On appeal, the defendant asserted two claims: First, she claimed that the court violated her fourteenth amendment right to family privacy by requiring her to make her child available to the plaintiff pursuant to § 46b-59. With regard to that claim, the defendant argues that §46b-59 impermissibly infringes on her constitutional right to raise her child. Second, the defendant claims that the court improperly applied § 46b-59 because the plaintiff already had access to the child." (Clements, supra p. 690)
The Appellate Court concluded that "the appeal was controlled by Roth v. Weston, 259 Conn. 202, 789 A.2d 431 (2002). "Implicit in the statute is . . . a rebuttable presumption that visitation that is opposed by a fit parent is not in a child's best interest. In sum, therefore, we conclude that there are two requirements that must be satisfied in order for a court: (1) to have jurisdiction over a petition for visitation contrary to the wishes of a fit parent; and (2) to grant such a petition. " (Clements, supra p. 690)
"First, the petition must contain specific, good faith allegations that the petitioner has a relationship with the child that is similar in nature to a parent-child relationship. The petition must also contain specific, good faith allegations that denial of the visitation will cause real and significant harm to the child. As we have stated, that degree of harm requires more than a determination that visitation would be in the child's best interest. It must be a degree of harm analogous to the kind of harm contemplated by [General Statutes] §§ 46b-120 and 46b-129, namely, that the child is neglected, uncared-for or dependent. The degree of specificity of the allegations must be sufficient to justify requiring the fit parent to subject his or her parental judgment to unwanted litigation. Only if these specific, good faith allegations are made will a court have jurisdiction over the petition. " Clements v. Jones,71 Conn. App. 688, p. 692. This court cannot make a finding by clear and convincing evidence that Miss McAndrew is an unfit parent required to give the codefendants jurisdiction in the case at hand. In fact the testimony of Dr. Berry is just the opposite — that Miss McAndrew is a fit parent and therefore the second prong of the Roth test must be applied.
"Second, once these high jurisdictional hurdles have been overcome, the petitioner must prove these allegations by clear and convincing evidence. Only if that enhanced burden of persuasion has been met may the court enter an order of visitation. These requirements thus serve as the constitutionally mandated safeguards against unwarranted intrusions into CT Page 826 a parent's authority." Roth v. Weston, supra, 259 Conn. 234-35.
"With regard to the harm prong of the jurisdictional test, we note that earlier in the Roth opinion, the Supreme Court delineated more specifically the types of harm that it referred to in the summation of the jurisdictional test. Particularly, the Roth court stated "it is unquestionable that in the face of allegations that parents are unfit, the state may intrude upon a family's integrity. . . . Therefore, it is clear that a requirement of an allegation such as abuse, neglect or abandonment would provide proper safeguards to prevent families from defending against unwarranted intrusions and would be tailored narrowly to protect the interest at stake." (Citations omitted. (Id., 224. Additionally, the Roth court also noted that "[a] more difficult issue is whether the child's own complementary interest in preserving relationships that serve his or her welfare and protection can also constitute a compelling interest that warrants intruding upon the fundamental rights of parents to rear their children. Specifically, we consider whether something less than an allegation and proof in support of abuse, neglect or abandonment will suffice to permit an-intrusion. " (Citations omitted; emphasis in original. (Id., 225. In answering that question, the court stated that "the only level of emotional harm that could justify court intervention is one that is akin to the level of harm that would allow the state to assume custody under General Statutes §§ 46b-120 and 46b-129 — namely, that the child is neglected, uncared-for or dependent' as those terms have been defined. We are persuaded, therefore, that an allegation, along with proof thereof, that the parent's decision regarding visitation will cause the child to suffer real and substantial emotional harm likewise presents a compelling state interest that will permit interference with parental rights. . . ." (Internal quotation marks omitted. (Roth v. Weston, supra, 259 Conn. 226. Thus, when read as a whole, the harm prong in Roth allows for allegations of both physical and emotional harm. Clements v. Jones, 71 Conn. App. 688, at 693.
In the case before this court, the court finds that the only harm to the minor child has been the ongoing pursuit of visitation and/or custody by the paternal grandparents. The court is in no way condoning Miss McAndrew's repeated contempt of court and intentional interference with the visitation rights awarded to the Foster, Sr.'s. However, the court would be doing irreparable damage to Ashley to remove her from the care and custody of her mother and the only family she has ever known. Not only would the change of custody be devastating to this child but she would be moved from Connecticut to the state of Florida where the paternal grandparents currently reside. This would make frequent contact with Ashley's mother, half-brother and maternal grandmother impossible. CT Page 827
As previously stated, the well-reasoned opinion of Judge Resha in Buchalter v. Buchalter, Superior Court, Judicial District of New Britain, docket number FA99-0493218S (February 8, 2002), suggests that Roth overrides prior court orders granting visitation rights to non-parent third parties against the wishes of a fit custodial parent; and Miss McAndrew has, moreover, moved to modify those orders in accordance with Roth.
Issue 2: Is it in the best interest of Ashley McAndrew to transfer custody to her father, Timothy Foster, Jr.?
Timothy Foster, Jr. has made little, if any, effort to keep in touch with his daughter. He has failed to communicate with her by telephone or letter, failed to send her gifts or presents for birthdays or holidays. In fact, he seemed to be unaware of, and unconcerned about, the turmoil (and the impact on Ashley (that has developed between his parents and his former wife. Mr. Foster, Jr. made no efforts to communicate with his daughter's teachers, schools or become involved in her life in any meaningful way. The court acknowledges that serious impediments to the development of a relationship between father and daughter have been made by Miss McAndrew but it appears to the court that little, if any, effort has been made by Mr. Foster, Jr. to initiate or nurture a relationship.
Additionally, and most significantly, Mr. Foster, Jr. is not seeking primary residence of Ashley for himself, but is seeking joint custody with his parents and primary residence with the paternal grandparents.
The court finds that it is not in Ashley's best interest to transfer custody to Mr. Foster, Jr.
 ORDERS
After considering all of the statutory criteria set forth in General Statutes § 46b-59 § 46b-56 and § 46b-57, together with applicable case law and the evidence presented her the court hereby enters the following orders:
1. Donanova McAndrew shall have sole custody of Ashley McAndrew;
2. There will be no visitation between Ashley and her father, Timothy Foster, Jr., for a period of one year. Father and paternal grandparents may send Ashley birthday and holiday (including but not limited to Christmas, Thanksgiving, Valentines Day and Halloween (cards and for gifts. The cards shall not imply or suggest a visit, telephone call CT Page 828 or-any communication in return. Miss McAndrew shall make sure Ashley receives and opens all mail from her father and paternal grandparents.
3. Ashley shall immediately begin therapy on a weekly basis with Renee Rhodes, Ph.D. Verification of weekly attendance shall be provided to the AMC and GAL. If Ashley misses more than two sessions (as a result of her mother's cancellations or failure to make an appointment), within a 3 week period, the court shall be immediately notified by the GAL. This therapist is to be totally insulated from the legal process and not subject to a subpoena for court testimony without prior approval of the court;
4. Miss McAndrew shall commence weekly therapy with Nina Rossomando, Ph.D. Verification of weekly attendance shall be provided to the AMC and GAL. If Miss McAndrew misses more than two sessions (as a result of her cancellations or failure to make an appointment (within a 3 week period the court shall be immediately notified by the GAL;
5. After a period of one year, the defendant father shall contact the GAL to advise the GAL if he remains interested in pursuing a relationship with his daughter. If he is, the GAL shall contact Ashley's therapist to investigate the possibility of commencing the reconciliation process. The GAL shall determine if it is appropriate to file a motion with the court to effect such reconciliation. If Ashley is willing, the GAL will advise the father and a separate therapist shall be appointed by the court who will work with mother, father and daughter toward reunification;
6. The court finds that the deliberate and willful actions and contempts of court by Miss McAndrew are the direct cause of the lack of a father-daughter relationship. As a result of her actions, the defendant father shall have no obligation to pay child support until such time as a reunification occurs.
7. The court finds that Miss McAndrew has willfully and intentionally violated every court order regarding visitation with the defendant father and paternal grandparents. Therefore, Miss McAndrew shall be liable for 50% of their legal fees to be paid at the rate of $250.00 per month commencing February 14, 2002. Said payments shall be made monthly on the 14th and shall be made to the GAL who shall forward the payment to the codefendants or their lawyer.
8. Additionally, as a result of Miss McAndrew's willful violation of every court order regarding visitation with the defendant father and paternal grandparents, she shall be solely liable for the fees of the CT Page 829 GAL from the date of her appointment for a period of one year from the date of judgment.
9. The fees of Dr. Susan Berry shall be divided with each party paying 25% of any outstanding balance
10. The parties to this action shall each pay 25% of all legal fees of the attorney for the minor child in the amount of $8,986.25 as of January 3, 2003. The parties shall receive the following credits: plaintiff, mother: $2,000.00; defendant father: $850.00 and defendants', paternal grandparents: $1,400.00. The plaintiff, mother's outstanding balance of $246.56 as of 1/3/03 shall be paid in full within 60 days of the date of judgement. The defendant father's outstanding balance of $1,396.56 as of 1/3/03 shall be paid in full within 60 days of the date of judgement. The defendants, paternal grandparents' outstanding balance as of 1/3/03 of $3,093.12 shall be paid in full within 90 days of the date of judgement.
11. The Regional Family Trial Docket and this judge personally, shall retain jurisdiction over all post judgement motions involving the custody, parenting access, therapy, support and welfare of the minor child for a period of one year from the date of this decision.
By the Court,
 ___________________ Holly Abery-Wetstone, Presiding Judge