[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff has filed a postjudgment motion for modification of custody, visitation, and order re: child care, dated September 4, 2002.
The plaintiff and the named defendant, Heather Bates, are the parents of Ashleigh D. Bates, born November 1, 1996. Said parents were never married to each other.
In 1998 the plaintiff commenced an action against the defendant seeking joint custody and visitation rights. On January 11, 1999, joint custody of Ashleigh was awarded to Mr. Aitkin and Ms. Bates, primary residence to be with Ms. Bates and a visitation schedule was ordered for Mr. Aitkin. Said orders were pursuant to agreement of the parties, and included visitation every Wednesday from 4:30 to 7:30 p.m. and every other weekend from Friday 4:30 p.m. to Sunday 7:00 p.m. Other provisions included holiday and summer vacation arrangements.
Subsequently, the issue of custody was referred to Family Relations for mediation/evaluation and a guardian ad litem was appointed.
On September 18, 2001 the maternal grandparent, Donna Bradford, moved to intervene as a party and, by agreement, her motion was granted.
On October 1, 2001, also by agreement, primary residence for Ashleigh was continued with Mr. Aitkin. (On or about August 6, 2001, Ms. Bates moved to Kentucky and shortly thereafter Ashleigh's primary residence was, de facto, with Mr. Aitkin).
Also, On October 1, 2001, the maternal grandmother Donna Bradford, was, by agreement, given access every other weekend from Friday (after daycare) to Sunday at 6:30 p.m. and each Wednesday after daycare to 6:45 p.m. CT Page 3464
We now come to the motion under consideration in which the plaintiff seeks to reduce Ms. Bradford's access to Ashleigh.
Both Mr. Aitkin and Donna Bradford were represented by counsel and testified at the evidentiary hearing. Ashleigh's mother, Heather Bates has a pro se appearance, but did not attend the hearing. She reportedly remains in Kentucky. (As noted, Heather Bates is Donna Bradford's daughter).
In addition to Mr. Aitkin and Ms. Bradford, the Court heard testimony from Laura Rumrill, Ashleigh's kindergarten teacher; Attorney Jacqueline Wilson, the guardian ad litem; Paul J. Lorenzo, a family relations office counselor; Kimberly Aitkin, the wife of Benjamin Aitkin; Katie Delisle, Kimberly Aitkin's sister and Edward Bates, Heather Bates' brother.
Applicable Law
In the cases of Roth v. Weston, 259 Conn. 202 (2002) and Crockett v.Pastore, 259 Conn. 240 (2002), the Connecticut Supreme Court has set forth principles which trial courts must adhere to when presented with issues of visitation of minor children by non-parents. The principles are clear and are summarized as follows:
1. Courts must presume that "fit parents act in the best interests of their children" and that "so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." Roth v. Weston, 259 Conn. 202,216 (2002).
2. There are limitations on the parental rights, for example if the parent is unfit, Id. at p. 224. Also, where there is proof of a close and substantial relationship between the child and the non-parent, and proof of real and significant harm should visitation be denied or so limited as to have that effect, Id. at p. 226.
3. The party seeking visitation must prove, by clear and convincing evidence, that the parents' decision regarding visitation will result in real and significant harm in order to rebut the presumption that a fit parent will act in the best interests of his or her child. (Roth, supra at pp. 230, 232.)
4. The Court must find real and substantial harm that is "akin to the level of harm that would allow the state to assume custody CT Page 3465 under Connecticut General Statutes §§ 46b-120 and 46b-129 — namely that the child is "neglected, uncared-for or dependent" as those terms have been defined. (Roth, supra at p. 226.)
5. Section 46b-120 (9) provides that a "child or youth may be found neglected who (A) has been abandoned, or (B) is being denied proper care and attention, physically, educationally, emotionally or morally, or (C) is being permitted to live under conditions, circumstances or associations injurious to the well-being of the child or youth, or (D) has been abused.
(It should be noted that a finding of neglect can be based on potential risk of harm and the state has authority to act before harm occurs. In reMichael D., 58 Conn. App. 119, 123-25 (2000).
6. Section 46b-120 (10) provides that a "child or youth may be found `uncared for' who is homeless or whose home cannot provide the specialized care that the physical, emotional or mental condition of the child requires."
7. The trial court cannot substitute its judgment for that of a fit parent because it believes a better decision could be made, even if that decision is arbitrary and neither serves nor is motivated by the best interests of the child, or if the parent may be acting capriciously. The test for a court to intervene in a parent's protected fundamental right to make child-rearing decisions is a showing by clear and convincing evidence of real and substantial harm. (Roth, supra, p. 223.)
Discussion
When Ashleigh was born she and her mother immediately moved in with Ms. Bradford. Ms. Bradford was an active participant in Ashleigh's life. Ms. Bradford had a job outside the home and after a month or so of staying home after Ashleigh's birth, she returned to work. Heather also resumed working shortly after and Ashleigh was in daycare thereafter.
Later Heather moved into her own apartment nearby but ate meals largely at Ms. Bradford's and Ashley spent substantial time with her grandmother at her house.
Around August 2001, Heather decided to move to Kentucky leaving Ashleigh, and in September 2001, Ashleigh went to live with her father and has remained there since that time, with visitation to Ms. Bradford as stated above. CT Page 3466
According to Ms. Bradford's deposition testimony, while she helped take care of Ashleigh until Heather left for Kentucky, it was Heather for the most part that bathed her and got up with her during the night.
The grandmother did not see herself as a second mother and stated that Heather was a "wonderful mother."
Mr. Aitkin was involved with Ashleigh almost from her birth. He paid child support and established the visitation schedule outlined above and has been the primary parent since September 2001.
Since the summer of 1998 he has lived with Kimberly Aitkin. He and Kimberly married in August 1999. They have a son, Colin, born October 11, 2002. Mrs. Aitkin is a school teacher (teaching second grade). She has acted as a mother to Ashleigh since Ashleigh came to live with them. Ashleigh now calls her "mommy," and enjoys being "an older sister to Colin." According to Kimberly, she and Ashleigh get along very well and they all interact as a family unit.
Testimony from Laura Rumrill, Ashleigh's kindergarten teacher was that Ashleigh is an excellent student, that her social behavior is very good and she presents no discipline or behavioral problems and that she refers to Kimberly Aitkin as her mom.
Mr. Aitkin proposes that Ms. Bradford's access be reduced to every fourth weekend (instead of every other week) and that the weekly Wednesday visits be eliminated.
Both the Family Relations officer and the guardian ad litem opine that there should be no reduction in Ms. Bradford's access.
Mr. Lorenzo (Family Relations Officer) believes there is a tension between Kimberly Aitkin and Ms. Bradford, which has a detrimental effect on Ashleigh and that results in the child being guarded in her conversations about the adults in her life. His opinion appears to mirror that of Dr. Colleen Dreyfus, a therapist who had been seeing Ashleigh until approximately one year ago. Mr. Aitkin is agreeable to therapy for Ashleigh, but would like to find a therapist more convenient to his home. (There does appear to be some tension between Mr. Aitkin and Dr. Dreyfus — which is likely another reason he would like to change therapists).
Mr. Lorenzo's concern is that Ashleigh has already been abandoned by her mother and there would be a heightened sense of abandonment if her contact with her grandmother is curtailed. He also opines that it would CT Page 3467 be neglectful for Mr. Aitkin not to arrange for continued counseling for Ashleigh.
It is this Court's opinion that Mr. Lorenzo's approach is that of whether it is in the child's best interests without regard to the constitutional implications set out in the Roth and Pastore cases cited. (This is, of course, very understandable given Mr. Lorenzo's role as a counselor and is not intended as a criticism.)
Attorney Wilson, recognizing the legal issues which must be addressed, stated that limiting or reducing Ms. Bradford's access will unequivocally result in harm to Ashleigh and will ruin her life. She claims that Ashleigh is unable to print her name, which she believes is a sign of her emotional conflict and anxiousness.
She also conceded there appears to be no harm to Ashleigh at this time from not having therapy for a year or more, but in the long term there would be significant harm in the future. Further, that the grandmother and her two sons who live with her are the child's anchor to the maternal family and to reduce that bond will, in her opinion, be harmful.
This Court, while it might well do otherwise if it were to consider only the best interests of the child, cannot reconcile the threshold requirements set out in the Roth and Pastore cases with the facts of this case.
There is no evidence that Mr. Atkins is not a fit parent. He has been the primary caregiver for the past one and one half years. He and his wife provide a stable family environment. They live in a single-family house and Ashleigh has her own room. Ashleigh is doing very well in school, both academically and socially. Although she has not been in therapy for a year or so, there are no outward manifestations of harm or regression. Any future harm is based on educated speculation and not empirical signs. The Court cannot find, by clear and convincing evidence the likelihood of future harm to Ashleigh from reducing the grandmother's access.
Nor can the Court conclude by clear and convincing evidence that the grandmother was in the position of a mother-daughter relationship with Ashleigh. Even though this was a close relationship, it did not reach that level.
Lastly, the Court cannot conclude that the level of harm which might occur is akin to that which would allow the State to take custody of Ashleigh as neglected, uncared for, or dependent. CT Page 3468
For these reasons the plaintiff's motion to modify is granted.
The maternal grandmother shall have access with the minor child Ashleigh every fourth weekend from Friday at 4:20 p.m. when she picks the child up at father's home until Sunday at 6:30 p.m. when the father shall pick the child up from the maternal grandmother's home.
The maternal grandmother shall have one full week (7 days) of summer vacation. The specific dates to be given to the father by May 1 on an annual basis.
The father has stipulated to continue therapy for Ashleigh with a therapist other than Dr. Dreyfus. The father shall consult with the guardian ad litem to arrange for a suitable therapist.
The father shall have sole legal custody of Ashleigh.
The motion for attorneys fees filed by Donna Bradford has been withdrawn. Also, her motion for increased access/visitation is subsumed by this decision.
The Court however, urges Mr. Aitkin to consider that Ashleigh's best interests will be served by maintaining a close relationship with her grandmother, and further urges both sides in this matter to be as accommodating and cooperative as possible for the child's sake.
Klaczak, JTR CT Page 3469